266 S.E.2d 114 (1980)
In re R.J.M.
No. 14612.
Supreme Court of Appeals of West Virginia.
March 25, 1980.
May 9, 1980.
C. Blaine Myers, Parkersburg, for R.J. M.
*115 Chauncey H. Browning, Jr., Atty. Gen., Billie Gray, Asst. Atty. Gen., Charleston, for Circuit Court, Wood County.
NEELY, Chief Justice:
This is an appeal from an order of the Circuit Court of Wood County terminating parental rights. The appellant parents make general assignments about the insufficiency of the evidence and argue that the circuit court should have granted them an improvement period pursuant to W.Va. Code, 49-6-5(a)(4) [1977] and 49-6-5(c) [1977]. Since their court appointed attorney did not move for an improvement period pursuant to W.Va.Code, 49-6-2(b) [1977] the appellants alleged ineffective assistance of counsel. We disagree and affirm.
R.J.M., the child involved in this proceeding, was born on 8 January 1978. Her mother was 16 years old at the time of R.J.M.'s birth and had left the tenth grade about a year earlier when she was pregnant with her first child Shawn. Shawn was also the subject of a neglect petition at the time of the proceedings under consideration here regarding R.J.M., and while the record does not develop the facts surrounding Shawn's removal from the home, it is apparent that he had been placed under the supervision of the Department of Welfare. R.J.M.'s father is an unskilled laborer suffering from a nervous condition.
In early March 1978, Gladys Foster, a mother of three and a grandmother, acquainted with the parents in this case because one of her daughters was living with them, noticed that R.J.M. looked ill and hungry. On her next visit, Mrs. Foster brought a jar of baby food and a jar of milk, which she fed to R.J.M. Mrs. Foster noticed no feeding problems or vomiting and in response to Mrs. Foster's suggestion that R.J.M. looked ill the mother promised to take her daughter to a doctor.
At about the same time, Isodene Alkire, a Department of Welfare homemaker who was working in the subject home, became concerned about R.J.M.'s health. She noticed that the child looked pale and unhealthy and observed that the mother had stopped giving her baby the prescribed formula and was substituting a mixture of Karo syrup, water and milk. When Mrs. Alkire asked the mother if she had discussed this change with her pediatrician she replied that she had not, but had made the change because the baby was spitting up the formula. Mrs. Alkire reported her concern to Larry Lowe of the Department of Welfare Child Protective Services Office who had been working with the parents since December 1977 concerning problems with their older child Shawn. On 3 March 1978, both Mrs. Alkire and Mr. Lowe visited the subject home and discussed with the mother the necessity for proper feeding of her child.
On 15 March 1978, Mrs. Alkire came to the subject home and took the mother and R.J.M. to Camden Clark Hospital in Parkersburg where R.J.M. was seen by Dr. Robert Crooks, a pediatrician, who found the baby to be suffering from gastroenteritis, dehydration and "failure to thrive" (malnutrition). R.J.M.'s skin showed the wrinkling and dryness common to undernourished children, a remarkable condition since R.J.M. had been a healthy normal seven pound eleven ounce baby at birth. R.J.M. had gained only one ounce in the two months since birth. The history given by the mother to Dr. Crooks was that her baby had been healthy until three days earlier when she developed diarrhea, began vomiting, and refused to eat. This was the first time the infant had been seen by a doctor since her birth.
R.J.M. was discharged from the hospital two weeks later, by which time her weight had increased by almost half to ten pounds ten ounces. Mr. Lowe, alerted by hospital staff members to the mother's apparent unwillingness to participate in a feeding program planned by Dr. Crooks, tried to discuss the matter with the mother before she took R.J.M. home, but found her uncooperative. He explained that the mother appeared not to understand the need for consistent feeding.
Mr. Lowe sought to maintain contact with the family following R.J.M.'s discharge *116 from the hospital and during the next several weeks he made numerous attempts to visit the mother and R.J.M. which were to no avail. Remembering that the mother was to bring R.J.M. for an appointment with Dr. Crooks on 4 April, he went to the doctor's office to await her arrival. The appointment was never kept and when asked about it the mother explained that she had forgotten. Mr. Lowe waited for the mother again at Dr. Crook's office on 7 April but again she did not come. On 10 April Mr. Lowe discovered that the parents had moved from their previous address. Three days later he located the mother at the home of a relative, in Belpre, Ohio.
Despite his many attempts to remain in touch with the family, Mr. Lowe was unable to locate them again until 24 April 1978 when he received a telephone call from Mr. and Mrs. Harry Love of Parkersburg, West Virginia. They informed Mr. Lowe that R.J.M. had been left in their care and was ill and in need of medical attention. R.J.M.'s parents could not be located and Mr. Lowe responded by arranging for the Department of Welfare to be given emergency temporary custody.
Later that same day, Mr. Lowe received a telephone call from the mother. She declined to divulge her whereabouts, but explained that the purpose of her call was to inform Mr. Lowe and the Department of Welfare that R.J.M. was in Ohio. She expressed dismay when Mr. Lowe informed her that her daughter was in the custody of the Department of Welfare and in a foster home. That same day R.J.M. was seen by Dr. Crooks who discovered that she was not ill but weighed only ten pounds five ounces, a loss of five ounces since her discharge from the hospital less than one month earlier.
Mr. Lowe tried eleven times during the following weeks to contact the parents in order to discuss R.J.M. with them, all to no avail. On 12 May 1978 he filed a neglect petition on behalf of R.J.M. and at the preliminary hearing the circuit court found probable cause to believe that the allegations in the petition were correct and ordered custody to continue in the Department of Welfare. At the close of the preliminary hearing counsel for the parents expressed his intention to move for an improvement period. The court scheduled a hearing on the motion, but at the hearing the motion was withdrawn without explanation and psychiatric examinations of both parents requested instead.
The adjudicatory hearing, held on 9 June 1978, resulted in a termination of the parental rights of the appellants. The court found by clear and convincing proof that R.J.M.'s illness, malnutrition and abandonment were the result of her parents' refusal to care and provide for the child and that there was
. . . no reasonable likelihood [sic] that the conditions of neglect or abuse can be substantially corrected in the near future as are necessary for the welfare of the child in that the parents have refused and not responded to or followed through with a reasonable rehabilitative effort of social, medical and other rehabilitative agencies designed to reduce and prevent the neglect of the child evidenced by the continuation of substantial and repeated acts of neglect after efforts were made by the West Virginia Department of Welfare, by the nurses at the hospital and by various other such agencies to supply the needed assistance to the family to avoid the neglect.
. . . that the mother is of average to above average intelligence, the father is of average intelligence, both of whom are able to grasp the nature and character of their failure to properly care for the child and the consequences thereof, and are able to understand and respond to the assistance, support, and help offered to them by the various child welfare agencies, and that the parents have, as disclosed by the evidence, willfully failed and refused to accept such services to the substantial detriment of the health, welfare and wellbeing of the child, and the substantial endangerment of the child's physical condition.
*117 We conclude that the Court's findings of fact are amply supported by the evidence and further conclude from the records that every possible opportunity was given to these parents to behave in a responsible way toward their child. While the record does not reveal trial counsel's continued insistence upon an improvement period, the record does reveal that such an insistence, under the facts and circumstances of this case, would have been a vain act.
Starvation is a particularly insidious type of child abuse; if the parents in the case before us had routinely flogged their child to within an inch of her life the legitimacy of the trial court's action would never been questioned. An infant less than a year old is at the utter mercy of the adults around her and unless her needs are anticipated by the parents they will be unmet, since the child is incapable of articulating her demands. W.Va.Code, 49-6-2(b) [1977] provides:
In any proceeding under this article, the parents or custodians may, prior to final hearing, move to be allowed an improvement period of three to twelve months in order to remedy the circumstances or alleged circumstances upon which the proceeding is based. The court shall allow such an improvement period unless it finds compelling circumstances to justify a denial thereof, but may require temporary custody in the state department or another agency during the improvement period. [Emphasis supplied by Court.]
Certainly it must have been obvious to all concerned that when these parents: (1) had permitted the child to come very close to starvation which was only averted by the intervention of outside authorities; (2) had contumaciously declined to follow the advice of qualified physicians and the Department of Welfare after the child's life had been jeopardized; and (3) had negligently or deliberately missed doctor appointments and concealed themselves from representatives of the Department of Welfare, a reasonable person would conclude that permitting this child to return to their custody would threaten the child's life. In a case such as this where return of the child to the parents might result in their absconding the jurisdiction and removing the child from effective supervision, there are certainly compelling reasons to justify the denial of an improvement period.
In addition, where a child is under the age of three immediate termination without an intervening period employing a less drastic alternative is more reasonable than in other cases. A child of that age has a far greater susceptibility to illness; the child is not as irrevocably attached to his parents; and, numerous placements may severely retard the child's ability to form lasting attachments. At the early stage of development a child needs close interaction with an adult fully committed to helping the child's emotional as well as physical development[1] and, it is difficult for foster parents to fulfill this role because they often fear forming a deep emotional attachment to the child.[2]
Furthermore, this Court finds that the trial court did not abuse its discretion or deny the appellants due process when it selected the most drastic remedy provided by W.Va.Code, 49-6-5 [1977], namely termination of parental rights, because all of the requirements for finding that "no reasonable likelihood that conditions of neglect or abuse can be substantially corrected" as set forth in Code, 49-6-5(b) [1977] were met. That section provides that no reasonable likelihood that conditions of neglect or abuse can be substantially corrected shall mean that:

*118 . . . (2) the parent or parents have willfully refused or are presently unwilling to cooperate in the development of a reasonable foster care plan designed to lead to the child's return to the parent or parents; (3) the parent or parents have not responded to or followed through with reasonable rehabilitative efforts of social, medical, mental health or other rehabilitative agencies designed to reduce or prevent the neglect or abuse of the child, as evidenced by the continuation of substantial or repeated acts of neglect or abuse after the provision of such services;. . .
For the reasons set forth above the judgment of the Circuit Court of Wood County is affirmed.
Affirmed.
MILLER, Justice, dissenting:
I dissent, since I believe the majority has ignored testimony in the record which casts substantial doubt upon the claim that this infant girl has been neglected. Furthermore, the majority has also ignored the order of precedence mandated by W.Va. Code, 49-6-5, by upholding the imposition of the most severe statutory disposition, that of total, permanent severance of the parental rights, when less restrictive alternatives could adequately protect the child.
The majority's statement of the facts of this case is not supported by the record. Foremost, it is important to note that as a whole, the medical testimony contradicts, rather than supports, a finding of neglect.
The infant's physician was Robert D. Crooks, a Parkersburg pediatrician. Dr. Crooks provided the only medical testimony in the record. He examined the infant on two occasions, first on March 15, 1978, when the mother, accompanied by Isodene Alkire, a welfare worker, brought the baby to the hospital for treatment. Dr. Crooks found the two-month-old infant to be suffering from "gastroenteritis, dehydration, and failure to thrive." He explained that gastroenteritis is a virus, "a condition of the intestinal tract characterized by either vomiting or diarrhea and usually by weight loss due to loss of fluid." Rather than attributing the infant's illness to starvation resulting from a pattern of parental neglect, as the majority characterized his testimony, Dr. Crooks found the condition to be wholly attributable to the onset of gastroenteritis a few days prior to his examination of the child.[1]
Dr. Crooks' second examination of the infant was on April 24, 1978, the day the Welfare Department seized custody of the child and brought her to Dr. Crooks for examination. Dr. Crooks examined the infant on that date and found her to be in good health.[2]
*119 Despite the favorable medical report, the Department of Welfare kept the baby and initiated proceedings to terminate parental rights. As of the time of final disposition on June 9, 1978, the infant had not been taken to a physician again. Dr. Crooks' testimony remains unrebutted by any other medical evidence. Thus, the State has terminated the parental rights of an infant found to be in good health, on the ground that the infant was starving.
In light of the fact that the medical testimony is favorable to the parents, the remaining lay testimony faces a heavy burden in order to nullify the medical testimony and meet the statutory requirement of abuse or neglect "proven by clear and convincing proof." W.Va.Code, 49-6-2(c).
Three persons in addition to Dr. Crooks and the infant's parents testified at the termination hearing: Gladys Foster, an acquaintance of the family who had observed the infant on several occasions, and Isodene Alkire and Larry Lowe, both employees of the Department of Welfare.
The majority accurately describes Mrs. Foster's testimony insofar as it includes her impression that the infant appeared ill and hungry. The majority, however, ignores her testimony relating to her observations that the infant always appeared clean and freshly clothed.[3] Thus, the only negative aspect of Mrs. Foster's testimony, that the infant appeared to be ill and hungry, was contradicted by Dr. Crooks, an acknowledged expert.
The majority states that Mrs. Alkire "became concerned about R. J. M.'s health," and "noticed that the child looked pale and unhealthy." Mrs. Alkire's testimony, however, contains no remarks to this effect. Her only testimony is a brief narration of a conversation she had with the infant's mother concerning its diet. The testimony gives no indication of apparent illness or lack of health, or other evidence of the presence or absence of proper care.
The remaining testimony in the record is that of Mr. Lowe, who described his difficulty over a period of time in locating the family. It is important to note, however, that nothing in the record indicates that the family was under any legal obligation to maintain contact with the Department of Welfare regarding the infant. There is no testimony that the family was enrolled in a Department of Welfare program beyond the fact that the Department had initiated proceedings to gain custody of the infant's older brother.[4]
The record is clear that the Department of Welfare had nothing to do with the infant's admission to the hospital on March 15. This admission was voluntarily undertaken by the mother, and the infant was released from the hospital to the mother on March 28. Most of the contact that Mr. Lowe had with the case was after the baby was released from the hospital.
It is apparent that the mother and Mr. Lowe had not maintained a good relationship regarding the infant. The presence of ill will might well be understood in light of the fact that Lowe was concurrently directing proceedings initiated by him for custody of the family's older child. The mother testified that she had attempted to elude Lowe because of her fear that the Department was also trying to take custody of R. J. M.  a fear that cannot be considered groundless in light of the proceedings *120 against the older child and the fact that the Department, upon locating the infant, did indeed seize custody and begin adoption proceedings, despite the medical findings of the infant's good health.
Because the medical testimony is favorable to the parents and the lay testimony is meager and equivocal, the finding of neglect by clear and convincing proof, as required by W.Va.Code, 49-6-2, is clearly erroneous.
Even if the finding had been correct, however, the dispositional requirements of W.Va.Code, 49-6-5, were violated. W.Va. Code, 49-6-5(a), sets forth six possible dispositions following a petition for abuse or neglect of a child.[5] The dispositions are listed in order of least to most severe, and this statute requires the court to adhere to that order, giving precedence to the least restrictive alternative that is appropriate to the circumstances. The last alternative, termination of all parental rights, is proper only where the preceding five alternatives are inadequate to redress the situation and only "[u]pon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future." W.Va.Code, 49-6-5(a)(6). Even then, under W.Va.Code, 49-6-5(b), in order to find "no reasonable likelihood that conditions of neglect or abuse can be substantially corrected," the court must find one of five specific grounds to exist in order to sever all parental rights.[6]
The record demonstrates that no such ground existed. First, there was no evidence that the parents were addicted to intoxicating liquor or drugs. W.Va.Code, 49-6-5(b)(1). Second, it cannot be found that the parents "willfully refused" to cooperate in the "development of a reasonable *121 foster care plan," since no such plan was ever offered them by the court. W.Va. Code, 49-6-5(b)(2). Third, it cannot be charged that the parents refused to follow through "with reasonable rehabilitative efforts of social, medical, mental health or other rehabilitative agencies," since no such alternative was ever developed and offered to the parents. W.Va.Code, 49-6-5(b)(3). Fourth, there is no showing that the parents abandoned the child. W.Va.Code, 49-6-5(b)(4). Nor does the fifth ground exist, that the parents repeatedly or seriously physically abused the child. W.Va.Code, 49-6-5(b)(5).
It is obvious from the foregoing statutory standards that with the exception of a finding of alcohol or drug abuse, abandonment or serious physical abuse, none of which were present in this case, the court is not empowered to sever the parental rights without some prior attempt at a rehabilitative program. In the present case, there is a complete lack of any such showing of a rehabilitative plan. Absent this, the majority is in clear error when it affirms the trial result.
The proper disposition, if we assume clear and convincing proof of neglect, would have been that the court fashion some type of rehabilitative program involving the parents and, if necessary, place the infant in the temporary custody of the Department of Welfare. Should the parents have refused to cooperate in the rehabilitative program, the court, at a later hearing, could have then made the determination to totally sever the parents' right.
The statutory expression of the parents' right to the least restrictive alternative before custody of their children can be permanently terminated is buttressed by constitutional grounds. In Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212-13, 31 L.Ed.2d 551, 558-59 (1972), the United States Supreme Court, in a related context, stated that:
"It is plain that the interest of a parent in the companionship, care, custody and management of his or her children `come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.' Kovacs v. Cooper, 336 U.S. 77, 95, 69 S.Ct. 448, 458, 93 L.Ed. 513, 527 [10 A.L.R.2d 608] (1949) (Frankfurter, J., concurring).
"The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed `essential,' Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, [626], 67 L.Ed. 1042, [1045], [29 A.L.R. 1446] (1923), `basic civil rights of man,' Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, [1113], 86 L.Ed. 1655, 1660, (1942), and `[r]ights far more precious. . . than property rights,' May v. Anderson, 345 U.S. 528, 533, 73 S.Ct. 840, [843], 97 L.Ed. 1221, [1226] (1953). `It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, [442], 88 L.Ed. 645, [652] (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, Meyer v. Nebraska, supra, [262 U.S.] at 399, [43 S.Ct. at 626], [67 L.Ed. at 1045], the Equal Protection Clause of the Fourteenth Amendment, Skinner v. Oklahoma, supra, 316 U.S. at 541, 62 S.Ct. [1111] at 1113, [86 L.Ed. at 1660], and the Ninth Amendment, Griswold v. Connecticut, 381 U.S. 479, 496, 85 S.Ct. 1678, 14 L.Ed.2d 510, [522] (1965) (Goldberg, J., concurring)."
The principles set forth in Stanley were acknowledged by this Court in a previous child neglect decision, In re Willis, 157 W.Va. 225, 207 S.E.2d 129 (1973). In Willis, the Court added that "We hasten to affirm that Article Ill, Section 10 of the West Virginia Constitution in equal measure protects this fundamental right of parenthood. See In re: Simmons Children, 154 W.Va. 491, 177 S.E.2d 19 (1970)." [157 W.Va. at 237, 207 S.E.2d at 137].
Where the constitutionally protected interests of parenthood are at stake, overriding *122 considerations permit impingement only to the minimum extent necessary to achieve the particular goal. See Note, Termination of Parental Rights and the Lesser Restrictive Alternative Doctrine, 12 Tulsa L.J. 528 (1977). The right to the least restrictive alternative in a child neglect proceeding relegates permanent termination of parental rights to the far end of a long list of alternative dispositions. See Derdeyn, Rogoff and Williams, Alternatives to Absolute Termination of Parental Rights After Long-Term Foster Care, 31 Vand.L.Rev. 1165 (1978); Wald, State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights, 28 Stanford L.Rev. 623 (1976). These are the precise standards set out in W.Va.Code, 49-6-5, but the majority has chosen to ignore them.
A careful reading of the majority opinion in comparison with the case record and our law demonstrates that the majority's analysis is both cursory and mistaken on this vital issue. A great injustice has been visited upon both the parents and the child, and we have allowed it to become irrevocable.
I have been authorized to state that Justice McGraw joins me in this dissent.
NOTES
[1] A. Clark-Stewart, Family Variables Related to Children's Development: Review and Recommendations, (Report for Carnegie Commission on Children 1974).
[2] Standards Relating to Abuse and Neglect 8.3, Juvenile Justice Standards Project (1977); and Wald, State Intervention on Behalf of "Neglected Children: Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights, 21 Stan.L.Rev. 623, 695-96 (1976).
[1] "Q [By the prosecuting attorney] Now, from your examination and the history you took, Doctor, you were not able to reach an opinion as to the cause of this condition of the child on that date, were you?

"A No. We assumed that it was a viral type of gastroenteritis, as most are.
"Q But that was  you made that opinion based on other cases which you have observed?
"A Yes, and on the medical examination.
.....
"Q [By the court] So I do understand you  would the viral infection also be responsible for the dehydration and failure to survive [sic ] and the weight of the child as you found it at that particular time?
"A Yes. Gastroenteritis is a cause of weight loss, and failure to thrive would be explained at that time from that immediate episode of gastroenteritis."
[2] At the preliminary hearing on May 22, 1978, Dr. Crooks testified as follows:

"Q [By the prosecuting attorney] Since the child was released from the hospital on March 28th of this year, have you seen the child since?
"A Yes.
"Q And when was that?
"A I saw this child again on April the 24th, 1978.
"Q And what was the condition of the child on that day?
"A The child appeared to be active, in good health. I found at that time no disease.
.....
"Q [By the attorney for the child] Between the time you saw her on the 15th and the time that you saw her again on April 24th, what in your opinion caused the change from all these feeding problems and so forth to active good health, in your opinion?
"A I think  well, the absence of any viral disease plus the fact that the baby was on a different formula."
[3] Mrs. Foster gave the following testimony at the preliminary hearing:

"Q Was the child clothed?
"A Yes.
"Q When you saw it at all times?
"A Yes.
"Q What condition were his [sic] clothes in?
"A Clean.
"Q Clean?
"A They were.
"Q Did the child smell bad or look very 
"A She just looked bad that is all.
"Q Was she dirty, the child?
"A She didn't look dirty to me."
[4] The record contains scant information regarding the basis for the proceeding involving custody of the older child, other than the fact that it had been initiated.
[5] W.Va.Code, 49-6-5(a), provides:

"(a) Following a determination pursuant to section two [§ 49-6-2] of this article, the court may request from the state department information about the history, physical condition and present situation of the child. The court shall forthwith proceed to disposition giving both the petitioner and respondents an opportunity to be heard. The court shall give precedence to dispositions in the following sequence:
"(1) Dismiss the petition;
"(2) Refer the child and the child's parent or custodian to a community agency for needed assistance and dismiss the petition;
"(3) Return the child to his own home under supervision of the state department;
"(4) Order terms of supervision calculated to assist the child and the child's parent or custodian which prescribe the manner of supervision and care of the child and which are within the ability of the parent or custodian to perform;
"(5) Upon a finding that the parents or custodians are presently unwilling or unable to provide adequately for the child's needs, commit the child temporarily to the custody of the state department, a licensed private child welfare agency or a suitable person who may be appointed guardian by the court;
"(6) Upon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future, and when necessary for the welfare of the child, terminate the parental or custodial rights and responsibilities and commit the child to the permanent guardianship of the state department or a licensed child welfare agency. Notwithstanding any other provisions of this article, the permanent parental rights shall not be terminated if a child fourteen years of age or older or otherwise of an age of discretion as determined by the court, objects to such termination. No adoption of a child shall take place until all proceedings for termination of parental rights under this article and appeals thereof are final."
[6] W.Va.Code, 49-6-5(b), states:

"As used in this section, `no reasonable likelihood that conditions of neglect or abuse can be substantially corrected' shall mean that: (1) The parent or parents have habitually abused or are addicted to intoxicating liquors, narcotics or other dangerous drugs to the extent that proper parenting ability has been seriously impaired and the parent has not responded to or followed through with recommended and appropriate treatment which could have improved the capacity for adequate parental functioning; (2) the parent or parents have willfully refused or are presently unwilling to cooperate in the development of a reasonable foster care plan designed to lead to the child's return to the parent or parents; (3) the parent or parents have not responded to or followed through with reasonable rehabilitative efforts of social, medical, mental health or other rehabilitative agencies designed to reduce or prevent the neglect or abuse of the child, as evidence by the continuation of substantial or repeated acts of neglect or abuse after the provision of such services; (4) the parent or parents have abandoned the child; or (5) the parent or parents have repeatedly or seriously physically abused the child."