IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2015 Term

FILED

March 2, 2015

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 14-0533

In Re:  C.M. and C.M.

Appeal from the Circuit Court of Raleigh County
The Honorable John A. Hutchison, Judge
Civil Action Nos. 12-JA-113 & 114

REVERSED AND REMANDED
WITH DIRECTIONS

Submitted: January 13, 2015
Filed:  March 2, 2015

Jacquelyn S. Biddle, Esq.
Huntington, West Virginia
Attorney for Petitioner, S.L.H.

Leigh Boggs Lefler, Esq.
Beckley, West Virginia
Guardian ad litem for C.M. & C.M.

Patrick Morrisey, Esq.
Attorney General
S.L. Evans, Esq.
Assistant Attorney General
Counsel for the West Virginia
Department of Health and Human
Resources

CHIEF JUSTICE WORKMAN delivered the Opinion of the Court.

JUSTICE LOUGHRY dissents and reserves the right to file a separate opinion.

SYLLABUS BY THE COURT

1.     "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

2.     "At the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child." Syl. Pt. 6, *In re Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991).

i

3. "As a general rule the least restrictive alternative regarding parental rights to custody of a child under *W. Va. Code*, 49-6-5 [1977] will be employed; however, courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults, and are likely to have their emotional and physical development retarded by numerous placements." Syl. Pt. 1, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980).

4. "Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, *W. Va. Code*, 49-6-5 [1977] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under *W. Va. Code*, 49–6–5(b) [1977] that conditions of neglect or abuse can be substantially corrected." Syl. Pt. 2, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980).

5. "It is a traumatic experience for children to undergo sudden and dramatic changes in their permanent custodians. Lower courts in cases such as these should provide, whenever possible, for a gradual transition period, especially where young children are involved. Further, such gradual transition periods should be developed in a manner

intended to foster the emotional adjustment of the children to this change and to maintain as much stability as possible in their lives." Syl. Pt. 3, *James M. v. Maynard*, 185 W. Va. 648, 408 S.E.2d 400 (1991).

Workman, Chief Justice:

This case is before the Court upon the appeal of the Mother, S.L.H.,[1] (hereinafter referred to as "the Mother") from the April 30, 2014, order of the Circuit Court of Raleigh County, West Virginia, terminating her parental rights. The Mother argues that the circuit court erred when it: 1) terminated her parental rights to her two children[2] because it was not the least restrictive alternative available; 2) abused its discretion by not granting her a dispositional period; 3) failed to place the children with their maternal grandmother;[3] and 4) allowed the children to remain in their paternal aunt's care. Based upon our review of the appendix record,[4] the parties' briefs and arguments, and all other matters before the

---

[1]Following this Court's established practice in cases involving children and sensitive matters, we use parties' initials. *See State v. Edward Charles L.*, 183 W. Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990) ("Consistent with our practice in cases involving sensitive matters, we use the victim's initials. Since, in this case, the victim ... [is] related to the appellant, we have referred to the appellant by his last name initial." (citations omitted)); *see also* W. Va. R. App. P. 40(e).

[2]The children are two boys, who are four years old and two years old. Both boys have names with the initials C.M.

[3]The maternal grandmother, pro se, filed a motion to intervene in this case on January 15, 2014. Contrary to the assigned error, the circuit court did not make any ruling regarding the grandmother's motion in its April 30, 2014, order that is the subject of the instant appeal. Moreover, by order entered May 20, 2014, the circuit court indicated that it had been advised that the grandmother "had filed a motion to intervene but after argument, the Court will consider her motion and will set a hearing on the motion in the future." Consequently, there is no factual or legal basis for this assigned error and the Court will not address it.

[4]The appendix record in this case does not comport with Rule 7 of the West Virginia (continued...)

1

Court, we reverse the circuit court's decision to terminate the Mother's parental rights and remand the case for the implementation of a gradual transition plan to return the children to the custody of their Mother.[5]

## I. Procedural and Factual History

On August 28, 2012, an abuse and neglect petition was filed against both

---

[4](...continued)
Rules of Appellate Procedure. Due to the inadequacy of the appendix record, this Court, by order entered January 16, 2015, requested the entire record in the case. From a review of the record below, it is evident that the West Virginia Department of Health and Human Resources ("DHHR") failed to include the case plans at issue in this case and failed to submit any written motion and supporting documents upon which the circuit court relied to terminate the Mother's parental rights. There were also salient orders entered by the circuit court that the parties failed to submit to this Court. Further, there are documents included in the appendix record that were not included in the record below. Those documents, which include certifications and letters regarding the Mother's treatment and case summaries prepared regarding visitation between the Mother and her children, may have been submitted as exhibits before the circuit court during hearings. The documents, however, were not contained in the record below.

We find it necessary to remind parties that they are bound to follow the West Virginia Rules of Appellate Procedure when pursuing an appeal before this Court, which includes the preparation and filing of an appendix record in compliance with our rules. The appendix record submitted in this case failed to comport with our rules; however, there was no objection to it by either the DHHR or the guardian ad litem.

[5]Because of the Court's decision to reverse the termination of the Mother's parental rights, we need not address the Mother's assignments of error regarding the circuit court's failure to grant her a dispositional period and to allow the children to remain in their paternal aunt's care.

2

C.R.M., who is the children's father,[6] and the Mother. The allegations in the petition concerned severe domestic violence, as well as alcohol and drug abuse in the presence of the infant children. The allegations included a referral to Child Protective Services ("CPS") on August 14, 2012, concerning both parents abusing alcohol and drugs, namely Oxycontin, and not providing a safe environment for the children. The petition also contained a referral to CPS on August 27, 2012, wherein the Mother, who was intoxicated, allegedly hid in the woods near the home with her two children, having fled due to a domestic altercation with the father. A preliminary hearing was held on October 18, 2012. By order entered October 26, 2012, the circuit court determined that probable cause existed warranting the removal of the children from the parents' home.

On December 6, 2012, the circuit court conducted an adjudicatory hearing. During the hearing, both parents stipulated to allegations of abuse and neglect. Specifically, the Mother stipulated "that she neglected her children through her drug abuse affecting her ability to parent her children." Both parents separately moved for post-adjudicatory improvement periods. The circuit court subsequently granted a six-month post-adjudicatory improvement period for each parent. The circuit court ordered that the Multi-Disciplinary

---

[6]The children's father's rights were also terminated by the circuit court as indicated in the April 30, 2014, order. The circuit court's termination of the father's rights is not before the Court.

3

Team ("MDT") was to meet by December 14, 2012,[7] and that a family case plan was to be developed and filed with the court by January 7, 2013. No case plan was placed in the record below or in the appendix record submitted before this Court.[8]

The appendix record also contained two monthly summaries for December 2012 and January 2013 prepared by Kelly Cook-Stevens, ASO Service Provider, regarding the Mother's visits with her children. In December 2012, Ms. Stevens supervised three visits between the Mother and her children. Ms. Stevens reported:

> [Mother]. . . is very interactive and affectionate with her children. She gets in the floor and plays with them and she made a tent with . . . [one child] and also played the Nintendo Wii. She balances the time equally between both boys and they

---

[7]The Mother represents in her brief that the MDT met on December 11, 2012, and a case plan was developed for the Mother. The Mother represents, and neither the DHHR nor the guardian ad litem dispute, that the "major components" of that case plan were:

1. [The Mother] . . . is to complete a psychological evaluation and follow recommendations of the psychologist.
2. [The Mother] . . . is to work one-on-one with her service providers.
3. [The Mother] . . . will successfully complete an inpatient substance abuse program.

The Mother further maintains in her brief that: 1) she completed the psychological evaluation on January 7, 2013; 2) the DHHR did not make a referral for services until August 2013 and that is when the Mother started counseling, which she successfully completed; and 3) she has successfully completed an inpatient substance abuse program.

[8]West Virginia Code § 49-6-5(a) (2014) requires the DHHR to "file with the court a copy of the child's case plan, including the permanency plan for the child."

4

interact very well with her. She changes their diapers throughout the visit and is very nurturing with both children. [One of the boys] cries at the end of the visits and she comforts him well and tries not to show any emotion.

In the January 2013 summary, Ms. Stevens reported:

Provider supervised three visits during the month of January. [Mother] . . . is very interactive and affectionate with her children. [Mother]. . . was very loving with both boys and focuses on them the entirety of the visits. She balances the time equally between both boys and they interact very well with her. She changes [the younger boy's] . . . diaper throughout the visit and is very nurturing with both children. [The older boy] . . . cries at the end of the visits and she comforts him well and tries not to show any emotion. She graduated from Turning Point on January 31st and seems to be doing well in her recovery.

The record also contained a March 6, 2013, report prepared by a CPS worker for DHHR. This report indicated that the Mother "has made progress towards completing the goals set forth in her Family Case Plan. She successfully completed Turning Point on January 31, 2013, and has successfully maintained sobriety." Further, visits with her children were described as "positive." The Mother "interacts with her children well and makes up games to play with them. She balances her time equally between both boys and is nurturing to both children."

On March 7, 2013, the circuit court held an improvement period review hearing. By order entered March 22, 2013, the circuit court noted that it was "advised that respondent mother is progressing and when she obtains beds for the children, weekend

overnights will be started for her and reunification is the permanency plan for her."

A report of the guardian ad litem, dated June 7, 2013, indicates that a MDT meeting was conducted on May 21, 2013, wherein it was noted that visitation had been increased between the Mother and her children, but then decreased due to the Mother's housing situation. "The MDT concluded that as soon as the Respondent Mother established a new housing arrangement with her mother, visitation could resume to overnights and there would be no opposition by any party to a three (3) month extension." Further, "there were no concerns with drug use on the part of the Respondent Mother." The recommendation was to give the Mother a three-month extension on her improvement period.

The circuit court held another improvement period review hearing on June 13, 2013. By order entered July 29, 2013, the circuit court stated that "the MDT is proposing and moving for a three (3) month extension to transition the children back to respondent mother which motion the Court hereby GRANTS."

On September 26, 2013, the circuit court conducted another improvement period review hearing. By order entered November 19, 2013, the circuit court noted that during the hearing on September 26, the circuit court "was advised that Respondent Mother was progressing but had suffered a relapse based upon alcohol intoxication and loss of a

6

job[,] but[,] since September 3, 2013, she has been re[-]employed and tested negative for three (3) weeks." According to this order, "[t]he Department was willing to agree to an extension of her improvement period on a dispositional basis but due to her denial of a problem, the Court, after argument, will take under advisement whether it will deny or grant an extension of her improvement period."[9] The circuit also directed the MDT to meet "within ten (10) days and create a treatment plan for . . . [the Mother] and report to the Court." No treatment plan or report is contained in the record.[10]

The appendix record reveals that the Mother entered an inpatient treatment facility on November 14, 2013. According to a letter dated January 3, 2014, from the Mother's attorney to DHHR, the Mother successfully completed Prestera's Addictions Recovery Center Program on December 7, 2013. Included with the letter was a treatment narrative indicating that she successfully completed the short-term residential program.

After completing Prestera's inpatient treatment program, the Mother enrolled

---

[9]Both the DHHR and the guardian ad litem represented in their respective briefs that by order dated September 26, 2013, the circuit court granted the Mother a requested extension of her improvement period. Contrary to this representation, according to the November 19, 2013, order, the requested extension was not granted. The circuit court only took it under advisement.

[10]Both the DHHR and the guardian ad litem represent that on October 4, 2013, the Mother signed a second case plan agreeing to attend inpatient rehabilitation. Once again, this case plan was not made a part of the record.

7

in Prestera's Co-Occurring Intensive Outpatient Program on January 16, 2014. On January 10, 2014, the mother also was accepted into the West Virginia Oxford House, a residential sober living program, located in Huntington, West Virginia.

The circuit court conducted another hearing on January 10, 2014. By order entered March 5, 2014,[11] as a result of the January hearing, the circuit court indicated that it "was advised that Respondent Mother is enrolled in the Oxford House in Huntington, WV, but the Department and *Guardian ad Litem* do not believe this facility is appropriate for her and that there is a bed at Storm Haven in Beckley, WV."[12] The case was continued status quo and another review hearing was scheduled for April 10, 2014. According to the April 30, 2014, order entered by the circuit court, "[a]nother identified problem with Oxford [H]ouse was that it was clearly not an appropriate place for children. This prevented the Department from beginning to reunite the children through overnight visitation and longer unsupervised visits."[13] The only reason given for this determination was found in the DHHR's brief wherein the following statement was made: "The facility was not considered

[11]Additionally, in this order the circuit court does not rule on whether it is going to grant the Mother a requested dispositional improvement period, but simply continues the case "status quo."

[12]The Mother indicated in her brief before the Court that the reason she chose the treatment program in Huntington was because she "felt she could be most successful in recovery to remove herself from the Beckley area where she had previously used and relapsed."

[13] This finding was not contained in the March 5, 2014, order.

8

to be an appropriate place for child visitation because it was apparently tended and staffed by recovering addicts." Notwithstanding this representation, there is no evidence in the record before the Court regarding why the DHHR and the guardian ad litem "believed" that the Oxford House was not appropriate for the Mother. Similarly, there is no evidence regarding why the Oxford House "was clearly not an appropriate place for children."

Also contained within the appendix record is a March 7, 2014, letter from Tara R. Henry, BA, a case manager with Prestera Center for Mental Health Services, Inc. Ms. Henry reports that the Mother is enrolled in Co-Occurring Intensive Outpatient Program that she started on January 16, 2014. Ms. Henry also indicates that the Mother is participating in "individual and group therapy, individual and group supportive intervention, as well as 12-step groups." Ms. Henry states that once the Mother graduates, she will be referred to the Substance Abuse Outpatient program to continue her recovery.

Further, the appendix record contains a letter, dated April 7, 2014, from Terry Johnson, an assistant outreach worker at the Oxford House. Ms. Johnson advises that the Mother

> has met all the requirements associated with membership and is in good standing. She is drug screened randomly and has passed them all. She has successfully found employment and is actively fulfilling her agreement with Oxford House West Washington by getting a sponsor, working steps and attending her choice of recovery meetings regularly.

A second undated letter in the record from Natalie Roe of the Oxford House indicates that the Mother "has become an amazing leader and accepted the responsibility of the house president. She has continued to gain employment and grow in her recovery." According to this letter, the Mother was scheduled to graduate on April 16, 2014, and she "maintains actively in the program through follow up therapy[,]" attending Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") meetings. She was also employed.

On April 10, 2014, the circuit court held a hearing[14] "on a motion to terminate the improvement periods of both parents, and for disposition of both parents." While the record contains a motion filed by the DHHR to terminate the father's parental rights, there is no motion filed by the DHHR seeking a termination of the Mother's parental rights.[15] The only mention in the record that disposition for the Mother might occur at this hearing was

[14]Notwithstanding the parties' failure to submit an appendix record that comports with West Virginia Rule of Appellate Procedure 7, which is applicable to abuse and neglect appeals, *see* note four *supra*, the parties also elected to proceed in this matter without transcripts of the hearings below as permitted by Rule 11 of the West Virginia Rules of Appellate Procedure concerning abuse and neglect appeals. *See* W. Va. R. App. P. 11 (i) ("In order to provide an inexpensive and expeditious method of appeal, the petitioner is encouraged to perfect an appeal under this Rule without the transcript of testimony taken in the lower court. In lieu of filing all or part of the transcript of testimony, the petitioner *shall set out in the petitioner's brief a statement of all facts pertinent to the assignments of error*.") (Emphasis added). The parties, however, failed to include in their briefs "all the facts pertinent to the assignment of error." *See id*. The parties' respective factual recitations contained in the briefs lack any discussion of the evidence that was introduced at the dispositional hearing that resulted in the termination of the Mother's rights.

[15]If the DHHR orally moved to terminate the Mother's parental rights, there is nothing in the record which demonstrates that.

10

found in the March 5, 2014, order wherein the court sets "[a]n improvement period review hearing or dispositional hearing on . . . [the Mother]" for April 10, 2014. The April 30, 2014, order regarding this hearing indicates that the circuit court heard testimony that the Mother had signed a case plan on October 4, 2013, agreeing to attend an inpatient rehabilitation facility. According to the order, she

> filled out intake forms for four (4) rehab facilities and was contacted by John D. Good Recovery Center for a phone interview and she stated she did not need detox and was removed from the waiting list. Respondent Mother was later admitted to Prestera's twenty eight (28) day Addictions Recovery Center on November 14, 2013, but left the program.[16] The Department had asked the Respondent Mother to move to a facility in Beckley, WV, so that the Mother could spend more time with her children because of the difficulty of transporting the children to Huntington and because Oxford House is not appropriate for any children's visitation.[17]

(Footnotes added).

---

[16]There is no evidence that the Mother left the program. The only evidence in the appendix record demonstrates that she successfully completed Prestera's twenty-eight day inpatient treatment program.

[17]As previously mentioned, there is no evidence in the record as to why Oxford House was not appropriate for children's visitation, only the DHHR's representation that the facility is "apparently tended and staffed by recovering addicts." Counsel for the Mother represented to the Court during oral argument that the treatment facility the DHHR recommended that the Mother go to in Beckley was similar to the Oxford House that the Mother enrolled in in Huntington. According to the website for Storm Haven, located in Beckley, like the Oxford House, it too is a "sober living environment" founded by Doug Stanley, who "was in recovery from alcohol addiction[.]" Storm Haven Recovery Home, http://stormhavenrecoveryhome.org (last visited March 2, 2015).

11

Following the April 10 hearing, but before the circuit court entered the April 30, 2014, order concerning that hearing, the Mother submitted a letter dated April 28, 2014, from Prestera Center indicating that the Mother "has completed 8 of the 9 interventions for her substance abuse treatment goal[,]" and had also "completed 3 of the 7 interventions of the goal for depression." The appendix record also contains a "certificate of completion" of "Prestera's Co-Occurring Intensive Outpatient Program" dated June 22, 2014, as well as log sheets showing that the Mother was attending AA/NA meetings.

By order entered April 30, 2014,[18] the circuit court found that: 1) the children had been in the custody of the DHHR for nineteen of the last twenty-two months; 2) the Mother had not substantially complied with the case plan she signed; 3) the Mother had not made sufficient progress towards reunification with her children; 4) the Mother was unwilling to make the reunification of her family her first priority; and 5) the Mother deliberately ignored reasonable directives of DHHR and recommendations contained in the treatment plan that she signed and agreed to follow. As the circuit court stated in its order, the Mother "refused to enter a long term intensive rehabilitation program, refused to move to a facility in Beckley where she could spend more time with her children, and failed to make any substantial progress toward reunification with her children in a timely manner."

---

[18]Following this order, on May 20, 2014, the circuit court entered an order allowing visitation by the Mother with her children to continue in Raleigh County "but not unsupervised or overnight."

12

Further, the order provided that the Mother "failed to show this Court by clear and convincing evidence that she will be able to comply with a future improvement period and further she has failed to prove by clear and convincing evidence that she is motivated to put her children's best interests ahead of her own personal pursuits." Based upon the foregoing, the circuit court terminated the Mother's parental rights to her two children, determined that "the infant children shall remain in the temporary legal and physical custody of the Department of Health and Human Resources with placement of the infant children to be in the discretion of the Department[,]" and found that "[t]he permanency has not been achieved but the Department has made reasonable efforts to achieve the same and that this hearing meets the requirements for foster care review . . . ." It is this ruling that forms the basis for the instant appeal.

## II. Standard of Review

This Court has explained that

> "[f]or appeals resulting from abuse and neglect proceedings, such as the case *sub judice*, we employ a compound standard of review: conclusions of law are subject to a *de novo* review, while findings of fact are weighed against a clearly erroneous standard." *In re Emily*, 208 W. Va. 325, 332, 540 S.E.2d 542, 549 (2000).

*In re J.S.*, 233 W. Va. 394, 400, 758 S.E.2d 747, 753 (2014). We have also applied the following standard of review to cases involving abuse and neglect proceedings:

> Although conclusions of law reached by a circuit court

13

are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. Pt. 1, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996); *accord In re B. H.*, 233 W. Va. 57, 754 S.E.2d 743 (2014)(applying same standard of review in abuse and neglect proceeding where mother admitted to neglect, circuit court adjudicated the children abused and neglected, and issue before Court concerned whether mother had substantially complied with terms of her post-adjudicatory improvement period). We are also ever mindful of our strong precedence in abuse and neglect cases that "the best interests of the child is the polar star by which decisions must be made which affect children.*" Michael K.T. v. Tina L.T.*, 182 W. Va. 399, 405, 387 S.E.2d 866, 872 (1989) (citation omitted); *see* Syl. Pt. 3, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996) ("Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children."). Guided by these standards of review, we turn to the arguments before us.

14

### III.  Discussion

#### A.  Termination of the Mother's parental rights.

The Mother argues that the circuit court erred in terminating her parental rights. More precisely, the Mother contends that the circuit court erred in finding that she left Prestera's Addictions Recovery Center early and that she had not made sufficient progress towards reunification with her children and had not substantially complied with the family case plan.  Conversely, the DHHR argues that the circuit court properly terminated the Mother's parental rights because she failed to demonstrate a reasonable likelihood that the conditions of abuse and neglect could be corrected.  The DHHR maintains that she "failed to comply with her improvement period or to consider recommendations that would result in her timely reunification with her children," because she ignored the DHHR's recommendations regarding where to enroll in treatment for her addiction thereby frustrating reunification with her children.

This Court has held that

> [a]t the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child.

Syl. Pt. 6, *In re Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991).  Moreover, we have held

15

that

> [a]s a general rule the least restrictive alternative regarding parental rights to custody of a child under *W. Va. Code*, 49-6-5 [1977] will be employed; however, courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults, and are likely to have their emotional and physical development retarded by numerous placements.

Syl. Pt. 1, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980). Finally,

> [t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, *W. Va. Code*, 49-6-5 [1977] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under *W. Va. Code*, 49-6-5(b) [1977] that conditions of neglect or abuse can be substantially corrected.

*In re R.J.M.*, 164 W. Va. at 496, 266 S.E.2d at 114, Syl. Pt. 2.

The undisputed evidence before the circuit court clearly demonstrated that the Mother successfully completed the twenty-eight-day inpatient rehabilitation at the Prestera Center. The record is completely devoid of any evidence that supports the finding that the Mother left this program. Moreover, completion of an inpatient treatment program was the requirement of her case plan and the record shows that she did complete such a program. Again, there is no evidence in the record, or in the circuit court's order, that supports any

16

finding that the Mother was directed by the circuit court to obtain treatment only where the DHHR recommended. Rather, the requirement placed on the Mother was that she had to undergo treatment. The Mother successfully completed both inpatient and long-term outpatient treatment programs for her addiction. She has also been participating in individual and group therapy, individual and group supportive intervention, as well as twelve-step groups. According to the Mother's brief, she has attended AA and NA meetings on a daily basis since January 10, 2014. Additionally, the Mother removed herself from the abusive relationship with the children's father. She remains sober, she is employed, she is going to attend college, and, according to her status update, she has obtained housing.[19]

The circuit court focused solely upon the Mother's failure to complete the treatment program in Beckley recommended by the DHHR. The DHHR maintained, and the circuit court found, that because of this, the Mother frustrated the goal of reunification with her children and failed to make her children her first priority.[20]

---

[19]In her status update filed with the Court pursuant to West Virginia Rule of Appellate Procedure 11(j), the Mother is currently living in Vienna, West Virginia, in an apartment with a one-year lease. She has been working at Red Lobster since October 20, 2014. She was previously employed by SRBI, a telemarketer, from March 2014 to October 2014. She was supposed to start school at WVU-Parkersburg on January 12, 2015, with the goal of becoming a surgical technician. She will attend classes on Mondays and Wednesdays. She continues to screen weekly for drugs and her results have been negative.

[20]Visitation between parent and child during an out-of-custody improvement period is important in evaluating whether a parent is making strides towards reunification with the child. As we stated in *In re Carlita B.*, "[a] parent's level of interest in visiting with his or
(continued...)

17

The Mother's choice of undergoing treatment for her addiction in Huntington as opposed to Beckley may have made it more difficult to visit her children. Despite the representations by the DHHR and the guardian ad litem regarding the difficulty with visitation caused by the Mother undergoing treatment in Huntington, there is no evidence

---

[20](...continued)
her child during an out-of-home improvement period is an extremely significant factor for the circuit court to review. A parent who consistently demonstrates a desire to be with his child obviously has far more potential for being a nurturant and committed parent than one whose interest in being with his child is erratic." 185 W. Va. at 628, 408 S.E.2d at 380. In the instant case, the Mother enunciated a sound reason for choosing the Huntington treatment program. Moreover, her interest in visiting her children was not at issue, rather the logistics of arranging visitations with the Mother was made more difficult due to her decision to enter a treatment program that was further away from her children. That decision was necessitated by her desire to remedy the thing that made her a neglectful mother – her addiction to drugs and alcohol. The DHHR, and the circuit court, therefore, lost sight of the purpose of the improvement period We also discussed the purpose of improvement periods in *In re Carlita B.* as follows:

> The goal should be the development of a program *designed to assist the parent(s) in dealing with any problems which interfere with his ability to be an effective parent and to foster an improved relationship between parent and child with an eventual restoration of full parental rights a hoped-for result.* The improvement period and family case plans must establish specific measures for the achievement of these goals, as an improvement period must be more than a mere passage of time. It is a period in which the . . . [DHHR] and the court should attempt to facilitate the parent's success, but wherein the parent must understand that he bears a responsibility to demonstrate sufficient progress and improvement to justify return to him of the child.

*Id.* at 625, 408 S.E.2d at 377.

regarding how visitation was made more difficult or, more importantly, how the Mother was purposely trying to thwart reunification with her children by obtaining treatment from one facility instead of the other. Likewise, despite statements in the DHHR's brief that the Oxford House in Huntington "was not considered to be an appropriate place for child visitation [including overnight visitation] because it was apparently tended and staffed by recovering addicts[,]" there was no evidence in the record to support this assertion. Nor was there any evidence in the record to indicate that Storm Haven in Beckley, which was the treatment facility recommended by the DHHR, was an appropriate venue for visitation, including overnight visitation. There is, however, evidence in the appendix record that demonstrates that the Mother maintained consistent visitation with her children during her improvement period. The record further demonstrates that during visitation with her children, the Mother was very nurturing and loving with them. She gave each child equal amounts of her time, prepared their meals, and played with them.

There is also a lack of evidence to support the circuit court's determination that "the Respondent Mother has shown that she is unwilling to make the reunification of her family her first priority." The record is devoid of evidence to support the circuit court's finding that "the Respondent Mother has deliberately ignored reasonable directives of the DHHR and recommendations contained in the treatment plan that she signed and agreed to follow." Neither does the record support the circuit court's finding that the Mother "failed

19

to make any substantial progress towards reunification with her children in a timely manner."

Rather, the appendix record demonstrates that the Mother successfully completed multiple treatment programs, obtained housing and employment, enrolled in college, and participated in successful visitations with her children. Thus, based upon our review of both the record below and the appendix record, we find the Mother was making steady progress during the post-adjudicatory improvement period. The circuit court erred in its findings to the contrary, including its determination that there was "no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future. . . ." *See* W. Va. Code § 49-6-5(a)(6). Having found that the circuit court's findings supporting termination were clearly erroneous, *see In re Tiffany Marie S.*, 196 W. Va. at 223, 470 S.E.2d at 177, we reverse the circuit court's decision.[21]

---

[21]West Virginia Code § 49-6-5 clearly establishes that termination of a parent's rights is the last resort. In this case, given the great strides made by the Mother, who by all accounts was and continues to be pursuing a path toward recovery from her addiction, there were other options short of termination of rights that the circuit court should have employed. According to West Virginia Code § 49-6-5:

> The court shall give precedence to dispositions in the following sequence:
>     (1) Dismiss the petition;
>     (2) Refer the child, the abusing parent, the battered parent or other family members to a community agency for needed assistance and dismiss the petition;
>     (3) Return the child to his or her own home under supervision of the department;
>     (4) Order terms of supervision calculated to assist the child and any abusing parent or battered parent or parents or

(continued...)

## B. Transition Period

Because termination of the Mother's parental rights is not warranted in this case, the priority now is to reunify the Mother with her children. Our concern in this case, and every case involving children, is the welfare of the children. The two boys in this case have been in the care and custody of the DHHR and the paternal aunt for the majority of their lives. Consequently, this case calls for a gradual transition period of custody to the Mother in a manner that will cause the least amount of trauma and stress for the two children involved. As this Court first held in syllabus point three of *James M. v. Maynard*, 185 W. Va. 648, 408 S.E.2d 400 (1991):

---

[21](...continued)

custodian which prescribe the manner of supervision and care of the child and which are within the ability of any parent or parents or custodian to perform;

(5) Upon a finding that the abusing parent or battered parent or parents are presently unwilling or unable to provide adequately for the child's needs, commit the child temporarily to the custody of the state department, a licensed private child welfare agency or a suitable person who may be appointed guardian by the court. . . .

(6) Upon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future and, when necessary for the welfare of the child, terminate the parental, custodial and guardianship rights and responsibilities of the abusing parent and commit the child to the permanent sole custody of the nonabusing parent, if there be one, or, if not, to either the permanent guardianship of the department or a licensed child welfare agency. The court may award sole custody of the child to a nonabusing battered parent. . . .

It is a traumatic experience for children to undergo sudden and dramatic changes in their permanent custodians. Lower courts in cases such as these should provide, whenever possible, for a gradual transition period, especially where young children are involved. Further, such gradual transition periods should be developed in a manner intended to foster the emotional adjustment of the children to this change and to maintain as much stability as possible in their lives.

*See Honaker v. Burnside*, 182 W. Va. 448, 453, 388 S.E.2d 322, 326 (1989). Further,

[a]s this Court stated in *In re George Glen B., Jr.*, 207 W. Va. 346, 355, 532 S.E.2d 64, 73 (2000), "[e]xplicit in both *Honaker v. Burnside* and *James M. v. Maynard* is the principle that the circuit court, and not the Department or a private agency, bears the burden of crafting a plan for the gradual transition of custody." Moreover, "[w]hen a circuit court determines that a gradual change in permanent custodians is necessary, the circuit court may not delegate to a private institution its duty to develop and monitor any plan for the gradual transition of custody of the child(ren)." Syllabus Point 7, *In re George Glen B., Jr.*

*Kristoper O. v. Mazzone*, 227 W. Va. 184, 195, 706 S.E.2d 381, 392 (2011).

Upon remand, we direct the circuit court to expeditiously set this matter for a hearing to establish a clear gradual transition period plan for reunification of the children with their Mother. Even though the length of a gradual transition period is within the circuit court's discretion, due to the length of time that the children have been with their paternal aunt, a transition period of several months similar to the one we discussed in *Honaker* would be reasonable. *See* 182 W. Va. at 453, 388 S.E.2d at 326. As in *Honaker*,

[f]or the transition period to be effective in accomplishing this purpose, it should provide for ever-increasing amounts of

22

> visitation for the natural . . . [Mother] so as to lead to a natural progression to full custody. Such transition plan should give due consideration to both . . . [the Mother's and the paternal aunt's] work and home schedules and to the parameters of the . . . [children's] daily school and home life, and should be developed in a manner intended to foster the emotional adjustment of these children to this change while not unduly disrupting the lives of the parties or the children.

*Id.* Additionally, the circuit court must impose specific conditions upon the Mother, such as attending regular AA /NA meetings, and must continue to closely monitor those conditions beginning with bi-monthly reviews for a reasonable period of time in order to be certain that the Mother continues her path to recovery.[22] On remand, the Mother also needs to demonstrate that she is able to care for her children, that her current residence is suitable for the children, that she is able to provide for the children and that she has childcare for the children when she is working and attending school. Lastly, it is in the best interests of the children for the circuit court to provide for the continued reasonable visitation between the children and their paternal aunt. The paternal aunt and these children undoubtedly have bonded and the close relationship formed as a result must be allowed to continue.[23]

This Court is fully aware that transitioning custody from the paternal aunt back

---

[22]The circuit court can gradually increase the time period between reviews as it deems appropriate.

[23]The DHHR should do all it can to facilitate the transition period in this case, including assisting with the visits between the Mother, the paternal aunt and these children, by aiding with transportation needs if necessary.

23

to the Mother is no small feat, both logistically and emotionally, for all involved. As we recognized in *Honaker*, "[n]o matter how artfully or deliberately the trial court judge draws the plan for these coming months, however, its success and indeed the chances for . . . [the children's] future happiness and emotional security will rely heavily on the efforts . . . [of the Mother and the paternal aunt]. The work that lies ahead for both of them is not without inconvenience and sacrifice on both sides." *Id.* We are optimistic that the Mother and the paternal aunt will work together for the sake of the children to show them that they are loved and to give them security and stability they need in their lives.

## IV. Conclusion

Based upon the foregoing, we reverse the decision of the circuit court and remand the matter for further proceedings consistent with this opinion. The Clerk of this Court is directed to issue the mandate in this case forthwith.

Reversed and remanded
with directions.

24