# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**FILED**

**March 16, 2021**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

*In re* **K.B.-1 and K.B.-2**

**No. 20-0574** (Cabell County 18-JA-251 and 19-JA-26)

## MEMORANDUM DECISION

Petitioner Father K.B., by counsel Kerry Nessel, appeals the Circuit Court of Cabell County's June 29, 2020, order terminating his parental rights to K.B.-1 and K.B.-2.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Mindy M. Parsley, filed a response in support of the circuit court's order. The guardian ad litem, David R. Tyson, filed a response on behalf of the children in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in terminating his parental rights because he substantially complied with the terms and conditions of his improvement periods.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In December of 2018, the DHHR filed a petition alleging that the mother tested positive for cocaine upon admission to the hospital to give birth to K.B.-1, the child exhibited symptoms of drug exposure upon birth, and the child's cord tested positive for high levels of cocaine. The mother admitted to abusing THC during the pregnancy. The DHHR further alleged that petitioner had a history of abusive conduct and incarceration, in addition to a history of domestic violence between the parents. Following K.B.-1's birth, petitioner spoke with Child Protective Services ("CPS") regarding the mother, describing her as a good parent despite his acknowledgment of her ongoing substance abuse and untreated mental health issues.

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). Additionally, because the children share the same initials, they will be referred to as K.B.-1 and K.B.-2 throughout this memorandum decision.

Thereafter, petitioner waived his right to a preliminary hearing. The DHHR then filed an amended petition to include allegations of abuse and neglect in regard to K.B.-2. The amended petition also included allegations that petitioner was on federal probation related to convictions for several crimes, including one conviction that involved a firearm and a crime of violence. Further, petitioner tested positive for marijuana four times while on probation. Accordingly, the DHHR included allegations about petitioner's own substance abuse resulting in neglect of the children.

At an adjudicatory hearing in February of 2019, the child's mother testified that she filed three domestic violence petitions against petitioner, but ultimately dropped the petitions because she wished to remain with him. The most recent petition was filed in February of 2018, at which time the mother indicated that petitioner said "he w[ould] kill [her] if [she] spoke to another, threaten[ed] to have family kidnap [her] child, [and] sen[t] females to the house to fight around [her] child." The mother also testified to an incident in May of 2018, during which petitioner shoved her down in front of one child while she was pregnant with the other. According to a criminal complaint regarding the incident, the mother had a bloody nose as a result of the altercation. The mother testified, however, that the criminal complaint misstated what actually happened and that she got the charge against petitioner dropped. During the adjudicatory hearing, the mother had a black eye, although she denied that petitioner was responsible or that she told anyone that he was responsible. However, a CPS worker testified that she received a photograph of the mother's black eye from the children's foster parent, who further stated that the mother indicated that petitioner caused the injury. The CPS worker also testified to the mother having previously told her that petitioner was involved in a stabbing incident, contrary to the mother's testimony at the adjudicatory hearing. According to the mother, she and petitioner talked twice a week but were "not really" meeting in person. Petitioner also testified and denied that any domestic violence between him and the mother ever occurred. Petitioner initially denied having used any illegal substances, but later admitted to having tested positive for marijuana several times while on probation. Based on this evidence, the court found that there was ongoing domestic violence between petitioner and the mother that affected their ability to parent the children. As such, the court adjudicated petitioner on the basis of domestic violence and its impact on his parenting. The circuit court also granted petitioner a post-adjudicatory improvement period.

For the next several months, the circuit court held a series of review hearings to address petitioner's compliance with his improvement period. At each hearing, the DHHR introduced evidence that petitioner was, at best, minimally compliant, given that he continued to fail to submit to drug screens as required and tested positive for marijuana when he did screen. The DHHR also introduced evidence of petitioner's continued relationship with the mother. In fact, at one hearing it was established that the mother was again pregnant and that she believed petitioner was the father. Moreover, the children's foster family indicated that petitioner admitted in text messages and phone calls that he continued to associate with the mother. During one call, petitioner requested that the foster family bring the children to meet the mother before she turned herself in on an outstanding arrest warrant. Additionally, the children's foster parents expressed safety concerns over petitioner contacting them and requested that the court order him to no longer directly contact the foster family. According to the record, petitioner was instructed by multiple parties, including his own attorney, that he could not continue his involvement with the mother, given their past history of domestic violence. Despite the fact that petitioner was never fully

2

compliant, the court continued his post-adjudicatory improvement period several times. The DHHR often opposed these improvement periods, asserting that petitioner's failure to comply with drug screens and his continued association with the mother constituted barriers to reunification with the children. The court also ordered on multiple occasions that petitioner cease all contact with the mother and begin fully complying with drug screens, otherwise he could face termination of his parental rights. Due to concerns over safety, the court also ruled that petitioner could only visit the children under supervision.

In August of 2019, the circuit court held another review hearing, during which a visitation supervisor testified that during a recent visit, one of the children went to the bathroom with petitioner. Upon exiting, the child told the supervisor that she had spoken to her mother on the phone but asked the supervisor not to tell anyone because she would get in trouble. When the supervisor questioned petitioner, he denied having made the call, but the supervisor did not ask to see petitioner's phone to confirm. A CPS worker further testified to having heard several recorded conversations between petitioner and the mother, who was incarcerated at the time. According to the worker, petitioner and the mother spoke over thirty times since the mother's incarceration. The CPS worker also testified to petitioner's decreased compliance since the last review hearing, given that he missed eight drug screens and continued to test positive for marijuana when he did screen. According to the worker, petitioner tested positive for marijuana on every screen he took since the prior hearing. The worker ultimately indicated that the DHHR did not believe petitioner could improve sufficiently to regain custody of the children, given his failure to address the two most important issues in the case. Nonetheless, the court granted petitioner an extension of his improvement period and again explicitly ordered that he have no contact with the mother.

Over the next two months, the court held additional review hearings and heard more evidence about petitioner's continued failure to fully participate in drug screens and his continued positive screens for marijuana when he did submit to testing. Further, petitioner's compliance with other services deteriorated, as he failed to meet with a parenting provider throughout October of 2019. One provider testified that petitioner was frequently unprepared for visitations and continued to purchase diapers that caused one child rashes, despite being instructed not to purchase that brand on multiple occasions. At one hearing, the children's foster father testified that K.B.-2 had been diagnosed with post-traumatic stress disorder. Despite petitioner's minimal compliance and failure to follow the court's direct and repeated instructions, the circuit court granted him a post-dispositional improvement period in November of 2019. Finally, at a review hearing in January of 2020, petitioner admitted that he remained in contact with the mother, despite the court's repeated direction to end the relationship.

In March and July of 2020, the circuit court held dispositional hearings, during which the DHHR introduced extensive evidence regarding petitioner's ongoing relationship with the mother, whose parental rights to the children were terminated earlier in the proceedings. This included the introduction of all recorded calls from the mother's jail from May of 2020 through June of 2020. According to the DHHR, there was no way to ensure that the children would not be in further danger of the mother's continued substance abuse and the domestic violence between the parents if they were returned to petitioner. Next, K.B.-2's family therapist testified to the behavioral problems the child exhibited as a result of witnessing domestic violence in the home. In addition to the diagnosis of post-traumatic stress disorder, the child exhibited violent behavior in the foster

home and was tearful when discussing having witnessed petitioner hurt the mother. The therapist further testified to K.B.-2's improvement through treatment and the stability provided by the foster home. The DHHR further presented evidence of petitioner's continued failure to submit to drug screens. This included evidence that after he was ordered to submit to a hair follicle test, petitioner arrived at the facility with a shaved chest and the facility was unable to obtain a hair from his head or legs. A DHHR employee also testified that petitioner failed to provide documents confirming that he submitted to substance abuse treatment, as he asserted. Petitioner testified, denying that he continued his relationship with the mother or that he was the person recorded talking to her while she was incarcerated.

Ultimately, the circuit court found that it gave petitioner "every chance possible with all possible improvement periods" but that petitioner would not follow simple orders despite constant warnings. Based on the evidence, the court found that petitioner failed to consistently submit to drug screens, would not cease contact with the mother, and failed to remain in contact with the DHHR. Further, the court found that petitioner was deceptive in his representations to the court about his relationship with the mother and his intentions to keep her in the children's lives. The court found that there was no reasonable likelihood that petitioner could substantially correct the conditions of abuse and neglect in the near future and that termination of his parental rights was necessary for the children's welfare. As such, the court terminated petitioner's parental rights.[2] It is from the dispositional order that petitioner appeals.

The Court has previously established the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner premises much of his argument on the assertion that the children should have been returned to his care, both during the proceedings and at their conclusion. According to petitioner, the circuit court's refusal to return the children to his care while he participated in his improvement period denied him the opportunity to continue to correct the

---

[2]The mother's parental rights were also terminated. The permanency plan for the children is adoption in the current foster home.

conditions that led to the petition's filing. Petitioner fails, however, to specifically explain how having the children in his care would have permitted him to better improve the conditions of abuse and neglect at issue. On the contrary, the record shows that throughout the proceedings the parties expressed concern about petitioner having unsupervised visitation, let alone custody. Given petitioner's failure to follow basic directions concerning drug screens and his continued association with the mother, in addition to his continued substance abuse, these fears were well founded. In short, petitioner failed to show the requisite progress when the children were out of his custody such that returning them would have been in their best interests. As such, petitioner's arguments on appeal are without merit.

In support of his argument, petitioner highlights the few terms and conditions of his improvement period that he did sometimes comply with, such as parenting services and therapy, in addition to his employment and suitable housing. He fails to recognize, however, that his compliance with some of these services waned as the matter progressed. Further, the record shows that petitioner never submitted any documents or other evidence to corroborate his substance abuse treatment. In short, petitioner ignores the evidence that overwhelmingly establishes that he failed to comply with the terms and conditions of his extended improvement periods below, instead choosing to distort the evidence by asserting that he was "painted in an unfair light by the parties involved" and was "still a work in progress." Additionally, petitioner argues that all the witnesses who testified regarding the recorded calls between him and the mother indicated that it was not petitioner on the recordings and that no evidence to the contrary was admitted. This is simply untrue, as multiple witnesses testified that it was, in fact, petitioner on the calls, and the circuit court listened to the calls and determined that it was clearly petitioner speaking to the mother. The circuit court also found that the witnesses who testified that it was not petitioner were his friends and had motivation to lie. We decline to disturb the court's credibility determinations on this issue. *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997) ("A reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations.").

As set forth above, the circuit court gave petitioner numerous opportunities to correct the conditions of abuse and neglect by taking the basic steps of submitting to drug screens, providing negative samples, and ceasing contact with the mother. Despite repeated warnings and various extensions, petitioner could not comply with these meager requirements, thereby demonstrating that there was no reasonable likelihood that he could correct the conditions of abuse and neglect in the near future. According to West Virginia Code § 49-4-604(d)(3), a circumstance in which there is no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected in the near future includes when the abusing parent has "not responded to or followed through with a reasonable family case plan or other rehabilitative efforts of social, medical, mental health, or other rehabilitative agencies designed to reduce or prevent the abuse or neglect of the child." It is clear that the circuit court had substantial evidence upon which to base this finding. Further, the court found that termination of petitioner's parental rights was necessary for the children's welfare, which was overwhelmingly supported by evidence of the threat that petitioner would continue to permit the mother to be around the children and the detrimental impact that their violent relationship had on the children. Pursuant to West Virginia Code § 49-4-604(c)(6), a circuit court may terminate parental rights upon these findings. Further, this Court has held that

"[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] . . . that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). Accordingly, we find that petitioner is entitled to no relief.

For the foregoing reasons, we find no error in the decision of the circuit court, and its June 29, 2020, order is hereby affirmed.

Affirmed.

**ISSUED**: March 16, 2021

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton