IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2022 Term

**FILED**

**October 21, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 21-0892

_____

In re: J.D.-1, M.F., J.N., J.D.-2, J.D.-3, and B.D.

_____

Appeal from the Circuit Court of Logan County
The Honorable Joshua Butcher, Judge
Civil Action Nos. 19-JA-176 through -181

AFFIRMED

_____

Submitted: September 7, 2022
Filed: October 21, 2022

Lauren Thompson, Esq.
Williamson, West Virginia
Counsel for Petitioner

J. Christopher White, Esq.
Wolfe, White & Associates
Logan, West Virginia
Guardian ad litem for
Infant Respondents

Patrick Morrisey, Esq.
Attorney General
Brittany Ryers-Hindbaugh, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for WVDHHR

CHIEF JUSTICE HUTCHISON delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.      "'Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.' Syl. Pt. 1, *In Interest of Tiffany Marie S.,* 196 W.Va. 223, 470 S.E.2d 177 (1996)." Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

2.      "Once a court exercising proper jurisdiction has made a determination upon sufficient proof that a child has been neglected and his natural parents were so derelict in their duties as to be unfit, the welfare of the infant is the polar star by which the discretion of the court is to be guided in making its award of legal custody." Syl. Pt. 8, in part, *In re Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973).

3.      "'Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code §

i

49-4-604] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604[(d)]] that conditions of neglect or abuse can be substantially corrected.' Syllabus Point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980)." Syl. Pt. 5, *N.R.*, 242 W. Va. 581, 836 S.E.2d 799 (2019).

**HUTCHISON, Chief Justice**:

Petitioner J.D.[1] appeals a final order entered on August 30, 2021, by the Circuit Court of Logan County, that terminated his parental rights to his six children and denied his motion to reconsider the court's prior order denying his motion for an improvement period. The circuit court ultimately concluded that there was no reasonable likelihood that the conditions of neglect – namely, the deplorable condition of the home in which the children were found to be living – could be substantially corrected in the near future.

Upon review of the parties' briefs, appendix record, oral argument, and applicable legal authority, and for the reasons stated below, we find no error and affirm the decision of the circuit court.

## I. Factual and Procedural Background

Petitioner's present involvement with the West Virginia Department of Health and Human Resources ("the DHHR") marks the third time in four years that he has been the subject of an abuse and neglect petition and his children have been removed from the home on an emergency basis for the same or similar reasons. In May of 2016, the

---

[1] In cases involving sensitive facts, we use initials to identify the parties. *See* W.Va. R. App. Proc. 40(e); *see also State v. Edward Charles L.,* 183 W.Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990). Additionally, because three of the children share the same initials, we identify them as J.D.-1, J.D.-2., and J.D.-3, respectively.

DHHR filed the first Petition for Immediate Custody of Minor Children in Imminent Danger ("emergency petition") seeking custody of the minor children J.D.-1, M.F., J.N., J.D.-2, and J.D.-3. The petition alleged that Mother J.J., the mother of then newborn J.D.-3, tested positive for controlled substances upon the child's birth. As it related to the condition of the home, the petition also alleged that the family "recently had to move out into another family's house due to not having electricity."[2] Petitioner was granted a pre-adjudicatory improvement period that required him to maintain adequate housing. Petitioner successfully completed the improvement period and regained custody of the children.

In November of 2017, following the birth of B.D. in August of 2017, the DHHR filed a second emergency petition. According to the petition, Child Protective Services (CPS) worker Rebecca Perry and case aid Stephanie Ryan visited the home where five of the six children were living with petitioner. The petition alleged that the "children's hygiene was all poor and they appeared dirty and unkept looking." One of the children, J.N., was observed with a knot and bruise over his right eye, with petitioner and Mother J.J.[3] giving different explanations as to how the injury occurred. Petitioner's house was reported to be in "very poor physical condition," including having huge holes in the walls

_____

[2] Caseworker Jaleesa Jones testified that prior to the filing of the 2016 petition and emergency removal of the children, the Department had received a referral regarding unsafe living conditions in the home.

[3] Mother J.J., the mother of J.D.-2, J.D.-3, and B.D., was staying at the home with petitioner and the children at the time the 2017 petition was filed.

that were stuffed with a mattress, and live electrical wires hanging from exposed ceiling rafters throughout the house and within reach of the children. The house had "minimal heat" such that "[t]he family had the stove tops all turned on High and the oven door was wide open, to assist in heating the family home." Space heaters that had been placed in the bedroom had clothing and debris piled around them. The CPS workers also observed "dirty dishes stacked up in the sink and on the counters, that had mice running over them." There was no working refrigerator.

Petitioner admitted to the allegations as set forth in the 2017 petition and was granted a post-adjudicatory improvement period. The DHHR provided petitioner with parenting and adult life skills classes as well as a set of bunk beds, a vacuum cleaner, microwave oven, and money to purchase lumber for home repairs. The guardian gifted petitioner a washer and dryer. Petitioner successfully completed the improvement period and regained custody of the children. Caseworker Jaleesa Jones testified that, at the conclusion of the 2017 proceeding, the DHHR advised petitioner that it would oppose any future improvement periods in the event a petition with similar allegations was subsequently filed.

Between the time the family was reunified in late 2018 or early 2019 and the filing of the present petition in December of 2019, the DHHR received at least five referrals concerning unsafe living conditions in petitioner's home. Ms. Jones testified that, with each referral, the DHHR requested that petitioner clean up the home so as to obviate the need for the filing of another petition. In each instance, petitioner complied with the request.

3

Ultimately, however, after receiving yet another referral on December 11, 2019, the DHHR filed the present emergency petition.[4] Specifically, the DHHR received a referral that children J.D.-2 and J.D.-3 "are seen daily with black on their hands and face," "hav[e] an odor;" and that the principal and teacher from the children's school clean the children's hands and faces in the mornings because they are "filthy." One of the children, J.D.-2, related that he could not state the last time he bathed because multiple puppies were being kept in the bathtub so they would not fall through the holes in the floor. J.N. told CPS worker Regina Short that petitioner had four blankets but "last night was not his [i.e., J.N.'s] night to have a blanket." Child J.N. was also found to have ringworm "from his chin down his body." Although petitioner told workers that J.N. contracted the ringworm over the weekend while he was staying with his mother, according to the petition, J.N.'s foster family subsequently took him to the emergency room for treatment and "[i]t was stated that he has had to have [ringworm] for a period of time for [it] to be that bad."

The petition also outlined the unsafe and unsanitary conditions existing in the home. When CPS workers Ashley Ranson and Ms. Short, along with law enforcement, arrived at the home, they observed the outside porch to be very cluttered, with "not much

---

[4] The 2019 petition named as respondents petitioner as well as Mother W.F., the biological mother of M.F., and Mother B.G., the biological mother of J.N. Mother W.F. has retained her parental rights and has consented to a guardianship of M.F. Mother B.G.'s parental rights have been terminated. The parental rights of these mothers are not at issue in this appeal. Mother E.F., the biological mother of J.D.-1 is deceased. The parental rights of Mother J.J., the biological mother of J.D.-2, J.D.-3, and B.D., were terminated in 2018. Her rights are not presently at issue.

room to stand . . . without stepping on glass or trash." There was fecal matter "all in the yard." The porch could not be reached without climbing a six-foot ladder. Wires from inside the home were connected to the meter box of the house next door. Once inside the home, the workers observed the home to be "trashy," "food swept up into a pile on the floor," miscellaneous items in piles all over the various rooms, a soiled mattress in the middle of the living room that was emitting a strong odor, and a strong odor coming from the refrigerator when opened. According to the petition, the "[c]eilings in most of the home appeared to be missing" and had wires hanging from them in multiple rooms, and one of the walls had plastic tacked to it and behind it was "insulation, framework, and the outside wall of the main side of the house." Boards were placed across the floor in the bedroom to cover up holes; when the boards were removed, the ground was visible. Built into a hole torn out of the bedroom wall was a gas-powered fireplace that faced the living room; and bags were piled within inches of the exposed flame. Two adult dogs and multiple puppies were kept in the bathtub so that they would not fall through the holes in the floors. The toilet flushed straight into holes dug into the ground beneath the home.

A preliminary hearing was held on January 15, 2020,[5] at which the circuit court heard evidence largely consistent with the allegations set forth in the emergency petition. Ms. Ranson, the CPS worker, testified that the home failed to meet the basic needs of any person, especially children, and that it was among the most unsafe homes that she

---

[5] Petitioner failed to appear at the January 15, 2020, hearing, but he was represented by counsel.

had ever visited during the course of her employment as a CPS worker. In an order entered on February 5, 2020, the circuit court noted that petitioner has "a long history with the [DHHR]" and that the DHHR satisfied its burden of showing that the children were in imminent danger of abuse and/or neglect at the time of the emergency removal and that there were no reasonable alternatives to the removal due to the emergency circumstances.

An adjudicatory hearing was held on March 16, 2020, at which petitioner appeared in person and was represented by counsel. Based upon petitioner's admissions to the unsuitable and unsafe living conditions at the time of the emergency removal, the circuit court adjudged the children to be "neglected children" as that term is defined in Chapter 49 of the West Virginia Code. Petitioner moved for a post-adjudicatory improvement period, advising the court that he had secured a more suitable residence that would soon be habitable for the children. The DHHR objected to the granting of an improvement period on the ground that

> this is the at least third time that these children have been removed from [petitioner's] residence since 2016 for exactly the same issue . . . . [T]here is no likelihood that [petitioner] can complete an improvement period. Because he has demonstrated now on three separate occasions where his children were removed from these conditions, that he does not have the ability to maintain housing appropriate for these children. Just in the 2017 case lasted a little over year. Those children were returned to [petitioner's] residence. . . . and we are back here about a year later with a house that's in completely deplorable conditions. . . . [He] has had two previous opportunities to address the exact same issues. And to his credit during those two cases, he did. . . . He fixed his residence. But each time it seems that the department gets a referral, the residence in which these children are living with

6

[petitioner] gets worse and worse. This court saw pictures and heard testimony at the preliminary hearing about the conditions that these children were found in less than a year after they returned after the department assisted [petitioner] in giving this house a makeover. . . . He fixes his house and as soon as we turn our head, he takes it apart again, and for whatever reason won't put it back together until the department takes his kids from him.

The guardian likewise objected to the granting of an improvement period, stating that he was not previously aware that petitioner had obtained a new residence and observing that "the situation has not remedied itself in the past cases . . . and I do have reservations about whether anything is going to change this time either." The guardian also informed the circuit court that petitioner "has not been proactive in maintaining contact with the department in attempting to exercise visitation[6] and that is gravely concerning to me, maybe more concerning than the failure of the home would be maintained [sic]." (Footnote added). The court permitted the guardian to visit the new residence while also recognizing the DHHR's position "that the condition of the home is somewhat irrelevant to the question of whether or not [petitioner] can improve long-term." Petitioner's motion for an improvement period was held in abeyance.

A hearing on petitioner's motion was held on June 2, 2020.[7] The DHHR renewed its objection to the granting of an improvement period. The guardian advised that

---

[6] Petitioner did not make contact with the Department until July of 2020, more than six months after the children were removed. *See infra*.

[7] The hearing was originally scheduled for March 31, 2020. However, it was delayed to June 2, 2020.

he visited the new home and submitted photographs to the court. In opposing an improvement period, the guardian reported that "there's still some serious impediments to safely housing children in that home." There were also questions as to the difference between the old home (which petitioner claimed to have torn down) and the new home, and "whether these are actually two different homes." The guardian informed the court that, even with the delay following the March 16th hearing on the motion for an improvement period[8] and petitioner's stated intention to work on and improve the home, "more could have been done, this is basically the same condition that I saw it in when we were last present back in March. There's no marke[d] improvement on the home."

By order entered on July 29, 2020, the circuit court denied petitioner's motion for an improvement period. The court specifically referenced the prior emergency abuse and neglect proceedings that involved similar allegations to the instant action and noted that petitioner has failed to take advantage of the numerous opportunities afforded to him "to address the unsafe and unsanitary living conditions in which he repeatedly lives with the Infants. . . . [A]lmost immediately following every reunification, the [DHHR] receives new referrals claiming the Infants are again living in unsafe and deplorable living conditions." The circuit court found that

> [f]or whatever reason, [petitioner] has demonstrated a total unwillingness or a complete lack of ability to maintain a residence suitable for any living person, let alone he and his numerous young children. In addition to the financial

---

[8] *See* n.7, *supra*.

assistance provided by the [DHHR] . . . and the generosity of a prior [guardian] who gifted [petitioner] new appliances, [petitioner] receives government assistance for all of his children. It is obvious from even a cursory review of the pictures submitted into evidence that virtually none of that income is being used by [petitioner] to maintain a residence suitable for he and his children. . . . By all indications from the evidence before the Court, [petitioner's] residence is in even worse condition than it was during either of the two previous emergency filings. Therefore, there are no additional services the [DHHR] can provide to [petitioner] which would further a goal of reunification in this matter as every service available to the [DHHR] has been previously explored and exhausted during prior court actions with [petitioner]. In essence, despite receiving services from the [DHHR] for many year[s], [petitioner] has always reverted back to his neglectful ways.

The circuit court concluded that petitioner failed to present any evidence in support of his motion for an improvement period and that he, thus, failed to meet his burden of demonstrating, by clear and convincing evidence, that he is likely to participate in one.

In the meantime, on July 1, 2020, the DHHR had filed a motion to terminate petitioner's parental rights on the ground that, based upon petitioner's history with the DHHR and the circumstances from which the children were again removed, there is no reasonable likelihood that the conditions of neglect that led to the removal can be corrected in the near future.[9] The guardian also recommended that petitioner's parental rights to the children be terminated. In a March 17, 2021, report, the guardian recounted that petitioner

---

[9] *See* W. Va. Code § 49-4-604(c)(6) [2020], discussed *infra.* For ease of reference, we refer to the most recent version of West Virginia Code § 49-4-604, which, although amended since the petition was filed in this case, the amendments do not affect the outcome.

"had a long period of not communicating with the [DHHR] and participating in visits with the minor children." Indeed, it was not until after the filing of the motion to terminate on July 1, 2020 – more than six months after the children were removed on an emergency basis – that petitioner and his then counsel finally contacted the DHHR by visiting the DHHR's office in Logan, providing petitioner's updated contact information, and expressing a desire to have visitation with the children. The guardian acknowledged in his report that, more recently, there has been regular visitation, but found that "the psychological bond between the children and [petitioner] is lacking." According to the report, petitioner often arrives late to the weekly hour-long visits with the children and the visits

> are interrupted by grievances [toward the providers] that . . .
> develop during the visit which, even if legitimate, could be
> resolved after the visitations end. The minor children complain
> that [petitioner] does not interact with them individually and
> that the visits are superficial. Both [J.D.-1] and [M.F.] have
> indicated that they would prefer not to visit with [petitioner].
> The younger children typically have more behaviors relating to
> acting out after a visit.

The report also noted that petitioner has moved residences multiple times since the filing of the petition and that "[g]eneral issues with safety within the home continue to exist and cause continued concern with [petitioner's] judgment and ability to parent. There is little transparency about how [petitioner] would financially meet the needs of his children and provide suitable living conditions for himself and the children if reunification occurred." Finally, the report concluded that "[t]he children have made

10

improvements in the more stable, nurturing environments in which they have been placed and it is in their best interest to continue this stability and care long-term."

A dispositional hearing was held on March 17, 2021, at which petitioner again moved for an improvement period.[10] Petitioner argued that the DHHR failed to link him to affordable housing, and that his prior counsel was so ineffective that petitioner was not made aware of what the DHHR expected of him for reunification to occur, including communicating with the DHHR, improving his living conditions, and participating in visits with the children. Notwithstanding the deficiencies of his counsel and the DHHR, petitioner argued, he improved his living conditions on his own and with his own money by obtaining and maintaining clean and appropriate housing.

Although petitioner had shown a willingness to comply with an improvement period by making efforts to maintain a clean and appropriate home, the guardian

> perceive[d] it as too little too late because of the lapse in the beginning of the case of any attempts of compliance and because of the – it just feels like it was too little too late and his bond with the children was irretrievably damaged by the lack of contact and the lack of effort. I would concede that he has made an effort since July or at least made more of an effort. But through the inception of the case for the first – the essential six or seven months of the case[,] nothing happened.

---

[10] By this time, petitioner had obtained current counsel. During the pendency of the proceedings, the Department reportedly filed a legal ethics complaint against petitioner's previous counsel. No substantive information concerning the complaint was disclosed to petitioner nor has been made a part of the appendix record.

The guardian further testified that petitioner failed to demonstrate that he can consistently maintain appropriate living conditions for the children long term: "The pattern of the state becoming involved when things are at a point where it's unlivable and unsafe, then some sort of return to something that is livable and is appropriate and the state not be involved and a quick return to it being unlivable and inappropriate, I mean it's a pattern and I fear that it would repeat." In the guardian's view, it was in the best interests of the children to deny petitioner an improvement period.

By order entered on April 9, 2021, the circuit court denied petitioner's motion for a dispositional improvement period. The court concluded that, despite petitioner's recent efforts to improve his living situation and participate in visits with the children, he failed to prove, by clear and convincing evidence, that he is likely to fully participate in an improvement period. The circuit court stressed that the similar circumstances giving rise to the prior and present emergency removals show petitioner's inability to maintain any lasting improvements in housing, which is detrimental to the children:

> While [petitioner's] living situation has changed multiple times even since the first time the matter was set for disposition and has arguably improved, and, even though he was permitted visitation for quite some time between then and now, the rationale behind the Court's ruling today and DHHR's position today remains the same; namely, that the long history of issues reflected in abuse/neglect petitions similar to this one coupled with the issues presented herein reflect the conclusion that the best interests of the subject children are not served by the granting of yet another improvement period – even more so in this situation where

12

more delay has been caused. The argument that [petitioner] is incapable of long-term resolution of the issues that bring him here once again are not changed by his evidence of quite recent improvements to his living situation, and, his argument that his prior counsel failed him in so many ways, while regrettable, is not justification for his failure to comply with the directives of this Court or for his being back in this situation for the third time in five years. The Court is reminded that the standard for whether [petitioner] should receive the benefit of an improvement period is whether he has shown by clear and convincing evidence that he is likely to fully participate. His past case shows that he did participate and successfully regained custody of his children, and since he did so, this Court finds it can fairly hold against [petitioner] that he does in fact know what it takes to address the issues in a child abuse and neglect case in which his children have been removed from his care. Accordingly, his argument that he did not know what DHHR wanted from him, or that his prior counsel wrongfully led him astray is disingenuous, as his behavior in his prior case demonstrated he did know what actions to take to regain custody of his children. [Petitioner] has demonstrated an inability to maintain a suitable living situation for any length of time – in the prior case and the instant case.

Petitioner thereafter filed a motion for reconsideration of the denial of an improvement period.

At a hearing held on April 12, 2021, the DHHR moved to terminate petitioner's parental rights. The guardian joined in the motion. After hearing evidence from all parties, the circuit court entered an order on August 30, 2021, terminating petitioner's parental rights and denying his previously filed motion to reconsider the denial of an improvement period. The court reiterated its prior findings particularly relating to the 2016 and 2017 petitions and the unsafe condition of the home and noted testimony from the DHHR that, when the 2017 case was concluded and the children reunified with petitioner,

13

that the DHHR informed petitioner that it would not agree to an improvement period should similar allegations regarding unsafe housing arise in the future. The circuit court further found that petitioner had previously been provided with services as well as transportation assistance and visitation, vouchers for bunk beds and a vacuum cleaner, money for home repairs, and appliances from the guardian, all in an effort to address the allegations that led to the filing of the 2017 petition. However, the court found, almost immediately upon the conclusion of that case, the DHHR began receiving new referrals concerning the uninhabitable condition of the home, which ultimately led to the filing of the emergency petition in the present case:

> [T]he issues affecting [petitioner's] residence appear to get worse over time and from case to case. What started out as a home without electricity ended up as a home in the deplorable conditions described above at the time of the most recent emergency removal at issue in the current case. Further, even though [petitioner] has previously completed two improvement periods in two prior abuse and neglect cases, he returns to his neglectful ways as evidenced by the continued issues with his home as outlined by the case workers and acknowledged by [petitioner].

The court thus concluded that there was no reasonable likelihood that the conditions of neglect that led to the removal of the children could be corrected in the near future, and that termination of his parental rights was appropriate. It is from this order that petitioner now appeals.

14

## II. Standard of Review

Circuit court orders in abuse and neglect proceedings are subject to the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.,* 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011). The deferential approach to a circuit court's findings in these cases is justified by "'[t]he critical nature of unreviewable intangibles'" and by the acknowledgment that that "'court is the better-equipped tribunal' to make substantive determinations"[11] concerning whether an

---

[11] *In re Charity H.*, 215 W. Va. 208, 215, 599 S.E.2d 631, 638 (2004) (internal citations omitted).

improvement period should be granted and parental rights terminated.[12] With these standards in mind, we now consider the parties' arguments.

### III. Discussion

*Denial of an Improvement Period*

On appeal, petitioner argues that the circuit court erred in denying his motion for an improvement period because he proved, by clear and convincing evidence, that he is likely to fully participate in the same, as evidenced by the fact that he successfully completed improvement periods in connection with the prior petitions that were filed against him in 2016 and 2017. According to petitioner, the unsafe condition of his home was directly related to his poverty and financial inability to structurally improve it to the satisfaction of the DHHR. He contends that his "singular need, which was specifically limited to the issue of appropriate housing" would have been "immediately and permanently solved" if the DHHR had simply linked him with federally subsidized housing years ago. Nonetheless, petitioner argues, despite the DHHR's failure to provide him with this specific service, he presented evidence that, for the five months immediately preceding the March 17, 2021, dispositional hearing, he maintained clean and appropriate housing on his own and with his own money and participated in weekly visitation with the children. Finally, to the extent the circuit court denied his request for an improvement period because he failed to contact the DHHR or participate in services – including visitation with the

---

[12] *See In re Rebecca K.C.*, 213 W. Va. 230, 233, 579 S.E.2d 718, 721 (2003) (quoting *In re Emily & Amos B.*, 208 W. Va. 325, 340, 540 S.E.2d 542, 557 (2000)).

children – for the first six months of this case, petitioner blames his previous counsel, who was so ineffective that the DHHR filed a legal ethics complaint against him during the pendency of the proceedings. Petitioner argues that he should not be held responsible for his prior counsel's apparent ethical misconduct.

The DHHR counters that the circuit court properly denied petitioner's requests for an improvement period. Although petitioner successfully completed improvement periods in connection with the prior petitions, the conditions in which the family were found to be living only a few short months after the 2017 case was concluded were among the worst the caseworker had ever seen, leading the DHHR and the circuit court to reasonably conclude that petitioner is unable or unwilling to sustain safe and sanitary housing for the long term. The DHHR also argues that petitioner's claim that his prior counsel led him astray as to what was required of him in order to reunite with the children is not credible given petitioner's prior involvement in proceedings similar to this one.

The guardian similarly argues that the circuit court did not err in denying petitioner an improvement period. The guardian contends that the court correctly found that although petitioner was given numerous opportunities to address the unsafe and unsanitary conditions existing in the home, his efforts have failed to show a lasting effect and, further that the DHHR can provide no additional services that would further a goal of reunification. Finally, the guardian reports that "the children have consistently improved

educationally and behaviorally since their removal" and contends that the denial of an improvement period was in their best interest.

We find no error. "[A]n improvement period in the context of abuse and neglect proceedings is viewed as an opportunity for the miscreant parent to modify his/her behavior so as to correct the conditions of abuse and/or neglect with which he/she has been charged." *In re Emily & Amos B.*, 208 W. Va. 325, 334, 540 S.E.2d 542, 551 (2000). Circuit courts are afforded discretion in deciding whether to deny an improvement period when no improvement is likely. *See In re Tonjia M.*, 212 W. Va. 443, 448, 573 S.E.2d 354, 359 (2002). "Both statutory and case law emphasize that a parent charged with abuse and/or neglect is not unconditionally entitled to an improvement period. Where an improvement period would jeopardize the best interests of the child, for instance, an improvement period will not be granted." *In re Charity H.,* 215 W.Va. 208, 216, 599 S.E.2d 631, 639 (2004). Indeed, the respondent parent bears the burden of showing that he or she should be granted the opportunity to remedy the circumstances that led to the filing of the abuse and neglect petition. More specifically, West Virginia Code § 49-4-610(3)(B) [2015] provides that "[t]he court may grant an improvement period . . . as a disposition . . . when . . . [t]he respondent demonstrates, by clear and convincing evidence, that the respondent is likely to fully participate in the improvement period . . . ." *See In re M.M.*, 236 W. Va. 108, 115, 778 S.E.2d 338, 345 (2015).

The record clearly supports the circuit court's decision to deny petitioner an improvement period in this case. The issue here is not, *per se*, whether petitioner would

18

*participate* in an improvement period. Indeed, we acknowledge that, in the 2016 and 2017 proceedings, petitioner successfully completed improvement periods, demonstrating that that he was capable of providing a home for his children that is safe, clean, and habitable, but only on a short-term basis. It became abundantly clear that, once the watchful eye of the DHHR was no longer upon petitioner, the conditions of the home soon became more unsafe, more unsanitary, and uninhabitable for any child. The undisputed evidence shows that within a few short months of regaining custody of the children in the 2017 case, the DHHR began receiving referrals concerning the unsafe condition of the home. The DHHR's Ms. Jones testified that the DHHR worked with petitioner by affording him at least five opportunities to remedy the unlivable conditions. Ultimately, the conditions were found to be so dire that the DHHR had no choice but to file the petition in this case and once again remove the children on an emergency basis. The home was found to have holes in the floors; exposed wiring in multiple rooms; rooms cluttered with trash, clothes, and other items; animals living in the bathtub; the presence of feces in the home and in the yard; a lack of working plumbing and electricity; and a porch that was strewn with broken glass and trash and that could only be reached by a six-foot ladder. Upon viewing photographs of the home that were taken at the time of the emergency removal, the circuit court observed it to be in even worse condition than it was during the previous emergency filings.

Petitioner's testimony that he recently expended effort and his own money to move to a house that would be safe and appropriate for the children, thereby demonstrating that he is likely to participate in an improvement period in this case, is of no

19

moment. As we have previously noted, it is possible for a person to be in "compliance with specific aspects of the case plan" while failing "to improve . . . [the] overall attitude and approach to parenting." *West Va. Dept. of Human Serv. v. Peggy F.*, 184 W.Va. 60, 64, 399 S.E.2d 460, 464 (1990). The circuit court concluded that petitioner had unequivocally shown that he is either unable or unwilling to sustain a habitable home without the DHHR's intervention, and we agree. Petitioner posits that the root of his housing problems is singularly attributable to the DHHR's failure to link him with federally subsidized housing early on, and that assistance in this regard during the course of the proceedings would have immediately and permanently resolved the issues in this case. Even a cursory review of the petition and evidence belies this argument. As we have previously described the condition of both the home and children at the time of the emergency removal, the DHHR's complaints go well beyond the structural issues with the home.

Moreover, any claim that petitioner was unaware that he was expected to contact the DHHR or undertake efforts to improve the deplorable living conditions from which the children were removed because prior counsel was ineffective is simply not credible. Petitioner was previously named as a respondent in two similar petitions in which he successfully completed improvement periods that resulted in reunification with the children. It is thus beyond cavil that petitioner knew what was required of him for reunification to occur in this case.

Finally, the evidence showed that denying petitioner an improvement period is in the best interests of the children. By failing to communicate with the DHHR or begin

20

searching for appropriate housing for more than six months after the children were removed on an emergency basis, petitioner, in the opinion of the guardian, irretrievably damaged his bond with the children. It was further reported that petitioner's weekly visits with the children were clouded by petitioner's persistent grievances to the providers, which he insisted on airing during the brief time he was allotted to spend with the children, all to the children's detriment. Without question, "the pre-eminent concern in abuse and neglect proceedings is the best interest of the child subject thereto." *In re Emily & Amos B.*, 208 W. Va. at 326, 540 S.E.2d at 553. We have held that

> [o]nce a court exercising proper jurisdiction has made a determination upon sufficient proof that a child has been neglected and his natural parents were so derelict in their duties as to be unfit, the welfare of the infant is the polar star by which the discretion of the court is to be guided in making its award of legal custody.

Syl. Pt. 8, in part, *In re Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973). For all of these reasons, we conclude that the circuit court did not abuse its discretion in denying petitioner's motion for an improvement period.

*Termination of Parental Rights*

Petitioner argues that the circuit court also erred in terminating his parental rights. He contends that the court, without specifically referencing West Virginia Code §

49-4-604(c)(7)(A),[13] treated the circumstances giving rise to the prior petitions as "aggravated circumstances" that, unjustifiably, relieved the DHHR of its obligation to make reasonable efforts to preserve the family. He argues that this "case simply does not present a long history of issues and sufficient severity to treat [petitioner's] case as one of aggravated circumstances." Likewise, petitioner argues, the facts of this case do not satisfy any of the provisions of West Virginia Code § 49-4-604(c)(7)(B), (C) or (D),[14] which very

---

[13] West Virginia Code § 49-4-604(c)(7)(A) provides as follows:

> For purposes of the court's consideration of the disposition custody of a child pursuant to this subsection, the department is not required to make reasonable efforts to preserve the family if the court determines:
>
> (A) The parent has subjected the child, another child of the parent or any other child residing in the same household or under the temporary or permanent custody of the parent to aggravated circumstances which include, but are not limited to, abandonment, torture, chronic abuse, and sexual abuse[.]

[14] West Virginia Code § 49-4-604(c)(7)(B), (C), and (D) provides as follows:

> For purposes of the court's consideration of the disposition custody of a child pursuant to this subsection, the department is not required to make reasonable efforts to preserve the family if the court determines:
>
> (B) The parent has:
>
> (i)    Committed murder of the child's other parent, guardian or custodian, another child of the parent, or any other child residing in the same

Continued . . .

22

household or under the temporary or permanent custody of the parent;

    (ii)    Committed voluntary manslaughter of the child's other parent, guardian, or custodian, another child of the parent, or any other child residing in the same household or under the temporary or permanent custody of the parent;

    (iii)    Attempted or conspired to commit murder or voluntary manslaughter, or been an accessory before or after the fact to either crime;

    (iv)    Committed a malicious assault that results in serious bodily injury to the child, the child's other parent, guardian, or custodian, to another child of the parent, or any other child residing in the same household or under the temporary or permanent custody of the parent;

    (v)    Attempted or conspired to commit malicious assault, as outlined in subparagraph (iv), or been an accessory before or after the fact to the same;

    (vi)    Committed sexual assault or sexual abuse of the child, the child's other parent, guardian, or custodian, another child of the parent, or any other child residing in the same household or under the temporary or permanent custody of the parent; or

    (vii)    Attempted or conspired to commit sexual assault or sexual abuse, as outlined in subparagraph (vi), or been an accessory before or after the fact to the same.

(C)  The parental rights of the parent to another child have been terminated involuntarily;

(D) A parent has been required by state or federal law to register with a sex offender registry, and the court has

Continued . . .

23

clearly provide what circumstances must exist for the DHHR to refuse to make reasonable efforts to preserve the family. According to petitioner, such reasonable efforts should have consisted of the DHHR linking him to federally subsidized housing, which would have immediately and permanently remedied all of the issues in this case.

We find petitioner's argument to be wholly without merit. To be sure, the facts and circumstances of petitioner's case do not come within the ambit of West Virginia Code § 49-4-604(c)(7). Indeed, the DHHR never argued, nor did the circuit court suggest, that the provisions of the statute applied to justify the termination of petitioner's parental rights. Rather, the circuit court observed that

> "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604[(d)]] that conditions of neglect or abuse can be substantially corrected." Syllabus Point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *N.R.*, 242 W. Va. 581, 836 S.E.2d 799 (2019).

---

determined in consideration of the nature and circumstances surrounding the prior charges against that parent, that the child's interests would not be promoted by a preservation of the family.

24

West Virginia Code § 49-4-604(c)(6) authorizes circuit courts to terminate parental rights "[u]pon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future and[] when necessary for the welfare of the child[.]" Pursuant to West Virginia Code § 49-4-604(d)(3), "[n]o reasonable likelihood that conditions of neglect or abuse can be substantially corrected" means, in relevant part, that,

> based upon the evidence before the court, the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help. Those conditions exist in the following circumstances, which are not exclusive:
>
> . . . .
>
> The abusing parent or parents have not responded to or followed through with a reasonable family case plan or other rehabilitative efforts of social, medical, mental health or other rehabilitative agencies designed to reduce or prevent the abuse or neglect of the child, as evidenced by the continuation or insubstantial diminution of conditions which threatened the health, welfare or life of the child[.]

As the evidence previously outlined in detail above shows, and which need not be repeated here, petitioner has demonstrated, over the course of two previous abuse and neglect proceedings and multiple referrals since then, that he is incapable of maintaining appropriate living conditions for the children for the long term and in their best interests. Thus, we conclude that the circuit court did not err in concluding that there was no reasonable likelihood that the conditions of neglect could be substantially corrected

25

in the near future, and that termination of petitioner's parental rights was necessary for the welfare of the children.

## IV. Conclusion

Based upon all of the foregoing, the circuit court's order is hereby affirmed.

Affirmed.