**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**FILED**
**June 7, 2024**
**released at 3:00 p.m.**
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

*In re* **A.B. and J.S.**

**No. 23-140** (Kanawha County 21-JA-625 and 21-JA-626)

**MEMORANDUM DECISION**

The petitioner Mother A.S.[1] appeals the Circuit Court of Kanawha County's February 28, 2023 order terminating her parental rights to A.B.-1 and J.S.[2] She asserts that the circuit court's errors included determining that she abused and neglected those children and then terminating her parental rights. Upon our review, a memorandum decision affirming the circuit court's order is appropriate. *See* W. Va. R. App. P. 21(c).

While this appeal arises from an abuse and neglect proceeding initiated by a petition filed in 2021, a prior abuse and neglect proceeding against the petitioner began in September 2020. The 2020 proceeding began with a petition alleging that petitioner's three- and two-year-old children, A.B.-1 and A.B.-2, were abused and neglected. The allegations in the 2020 petition included A.B.-2's extreme malnourishment, domestic

---

[1]The petitioner appears by counsel Benjamin Freeman. The West Virginia Department of Human Services appears by counsel Attorney General Patrick Morrisey and Assistant Attorney General Kristen E. Ross. Counsel Sharon K. Childers appears as the children's guardian ad litem ("guardian").

Additionally, pursuant to West Virginia Code § 5F-2-1a, the agency formerly known as the West Virginia Department of Health and Human Resources was terminated. It is now three separate agencies—the Department of Health Facilities, the Department of Health, and the Department of Human Services. *See* W. Va. Code § 5F-1-2. For purposes of abuse and neglect appeals, the agency is now the Department of Human Services ("DHS").

[2]We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e). Additionally, because one of the children and a child who is not the subject of the abuse and neglect proceeding share the same initials, we will refer to them as A.B.-1 and A.B.-2, respectively.

1

violence between the petitioner and the father of A.B.-1 and A.B.-2, and the petitioner's drug use. The petitioner completed an improvement period and received services from the DHS, and the circuit court dismissed the 2020 petition against the petitioner.

Only three months after that case was dismissed, in October 2021, the petitioner called 911 claiming that A.B.-2 was in cardiac arrest. When emergency personnel arrived, they discovered A.B.-2 deceased and already in a state of decomposition with maggots on her body and skin slippage, along with the bed sheets soiled with bodily fluids. A.B.-1 was present in the home.

Shortly thereafter, the DHS filed the 2021 abuse and neglect petition. The petition alleged that A.B.-1 and the petitioner's older child, J.S., were abused and neglected children.[3] In addition to describing the circumstances surrounding the discovery of A.B.-2's death, the petition alleged that the petitioner failed to provide the children with necessary food, clothing, supervision, housing, and consistent financial support. An amended petition asserted that the petitioner tested positive for methamphetamine on the date that A.B.-2 was found deceased, and a second amended petition claimed that alcohol was found in the deceased child's system.

During the preliminary hearing, a police officer and a paramedic testified regarding responding to the 911 call. The paramedic stated that when he arrived at the home, A.B.-2 had no pulse. After removing the child from the dimly lit home to better observe her condition, emergency personnel realized the child was deceased. The paramedic testified that A.B.-2 was cold to the touch and stiff, her skin was pale, her eyes were sunken in, and there were live maggots on her body. He described A.B.-2 as wearing an old, soiled diaper with dried stool and urine stains and having a feeding tube in the abdominal region. The police officer explained that when he arrived, the paramedics had already taken the child to the ambulance and determined she was deceased. He stated that A.B.-1 was present at the home, and the officer saw the bedroom where responders found A.B.-2. He described the bed where A.B.-2 was found as soiled with what appeared to be fluids in the outline of the child's body and with maggots in the sheets. At the conclusion of the hearing, the court found probable cause to ratify A.B.-1's removal from the home. J.S. was already in the care of her nonabusing father.

The court held two adjudicatory hearings. During testimony from the forensic pathologist who conducted the autopsy of A.B.-2's body, the court admitted the autopsy report into evidence with no objection. According to the pathologist's testimony and autopsy report, the child had a history of medical issues and hospitalizations, beginning with "in-utero maternal exposure to poly-substance abuse," meaning she was born drug-affected. The pathologist testified that A.B.-2 died due to "failure to thrive . . . caused by

---

[3]J.S., born before A.B.-1 and A.B.-2, lived with her nonabusing father, and was not named in the original 2020 abuse and neglect petition.

2

congenital and born defects," including hypothyroidism, which was caused by underdevelopment and malformation of the brain. The child also had an inappropriately formed larynx, which caused issues with swallowing and eating, resulting in a gastric feeding tube. Further, the pathologist explained that physicians diagnosed A.B.-2 with occasional malnutrition and dehydration her entire life. Importantly, the pathologist testified that a toxicology report revealed alcohol in A.B.-2's system, which was introduced from outside her body and not caused by any fermentation after death. According to the pathologist and the autopsy report, the presence of alcohol in A.B.-2's system was a "significant contributing condition" to the child's death. A police detective who responded to the scene then testified. He told the court about the appearance of A.B.-2 in the ambulance and described what he found in the home, then told the court that the petitioner tested positive for methamphetamine and marijuana on the day the child was found deceased. Finally, the DHS called a child forensic interviewer to testify regarding an interview she conducted with A.B.-1. According to the interviewer, A.B.-1 described instances in which the petitioner left A.B.-2 alone. A.B.-1 said, "[w]hen mommy and me stayed away at nighttime, sissy would freak out when she was awake" and that A.B.-2 hated being alone. When describing where they would go, A.B.-1 said they would go to "mawmaw's and pawpaw's" and no one would stay with A.B.-2. When the forensic interviewer asked A.B.-1 what the petitioner would do if A.B.-2 was crying, A.B.-1 said the petitioner would put things in A.B.-2's mouth, including a pacifier, tissues, and a shoe.

The petitioner also testified, explaining that she did not feel responsible for what happened to A.B.-2. On the day emergency personnel responded after she called 911, the petitioner stated that A.B.-1 was downstairs watching cartoons and that they had been sick with COVID-19. The petitioner explained that A.B.-2 was upstairs, and the last time she checked on A.B.-2—three hours before she called 911—A.B.-2 was asleep. She told the court that when she went upstairs, A.B.-2 had passed away. The petitioner denied anything being wrong with the child when she last checked and could not explain the maggots found on the child's body or the state of decay. The petitioner denied harming the child or ever leaving her alone and further denied that A.B.-2 was born drug-affected, although she admitted to having substance abuse issues in the past. The petitioner denied using methamphetamine but admitted to smoking marijuana regularly and on the day her child's death was discovered. Regarding alcohol being found in the child's system, the petitioner suggested that it could have been from contaminated formula and insisted she did not give the child alcohol. In regard to the earlier abuse and neglect proceeding, she asserted that A.B.-1 and A.B.-2 were returned to her care in February 2021, although the dismissal occurred in July 2021. The petitioner further testified that she had not seen J.S. in about five years.

At the conclusion of the testimony, the court found that the petitioner's testimony was not credible and also that the children were abused and neglected. Therefore, the court adjudicated the petitioner as an abusing and neglecting parent and A.B.-1 and J.S. as abused and neglected children. In the adjudicatory order, the court made specific findings

3

regarding the circumstances of A.B.-2's death and A.B.-1's presence at the home while A.B.-2 decayed and petitioner's positive drug screens. The court also found that the petitioner "had not had contact with [J.S.] for years and she has not provided any type of support, financial or in-kind[,] during this time."

During the dispositional hearing in February 2023, which the petitioner's counsel attended, but the petitioner did not, the DHS and guardian ad litem supported termination of the petitioner's parental rights. A CPS worker testified that the petitioner received services in the prior abuse and neglect case and that A.B.-2's death occurred not very long after the children were returned to her custody. The court then found that there was no reasonable likelihood that the conditions of abuse and neglect could be substantially corrected in the near future and that the best interests of the children required termination of the petitioner's parental rights.[4] The petitioner now appeals.

On appeal from a final order in an abuse and neglect proceeding, this Court reviews the circuit court's findings of fact for clear error and its conclusions of law de novo. Syl. pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011). The petitioner claims that the circuit court clearly erred by finding that she abused and neglected her children and by subsequently terminating her parental rights. She primarily argues that the court's determination regarding abuse and neglect, and later termination, should not have been based on A.B.-2's death, as the DHS failed to prove the petitioner caused the death. She further contends that the petition, as amended, did not allege that she failed to visit J.S. and she asserts that termination was not the least restrictive alternative. Finally, the petitioner argues that the court denied her services regarding her substance abuse issues.

We find no error in the circuit court's determination that A.B.-1 and J.S. are abused and/or neglected children. The court's findings "[a]t the conclusion of the adjudicatory hearing" must include whether a child is abused or neglected and whether the respondent parent is abusing or neglecting. W. Va. Code § 49-4-601(i). These findings must also "be based upon conditions existing at the time of the filing of the petition and proven by clear and convincing evidence." *Id.* The petitioner argues that because the DHS did not prove she caused A.B.-2's death, she cannot be found to have abused and neglected her other children. However, the DHS presented ample evidence of the circumstances surrounding the death of A.B.-2, and this testimony directly relates to the adjudication of A.B.-1 as an abused and neglected child, as he was present at the home before and during the discovery of A.B.-2's death. Regarding A.B.-2, the court heard testimony of investigating officers, a paramedic, and a forensic pathologist. These witnesses explained how the child was born drug-affected due to the petitioner's substance abuse and how the petitioner continued to use methamphetamine, as she tested positive for methamphetamine on the day the child's

---

[4]The father of A.B.-1 had his parental rights terminated, and the permanency plan for this child is adoption in his current placement. The father of J.S. is nonabusing, and the permanency plan for this child is to remain in her father's custody.

death was discovered, while she purportedly cared for A.B.-1. Furthermore, a prior abuse and neglect case began after a pediatrician recognized A.B.-2's extreme malnourishment. Then, only three months after A.B.-1 and A.B.-2 were returned to the petitioner's custody, A.B.-2 was found deceased. The evidence established that, among the many issues that contributed to her death, the child was dehydrated and had alcohol in her system that was not the result of fermentation after death. Also, emergency personnel found A.B.-2 decomposing, with maggots on her body, demonstrating that the child had been deceased for some time before they were called, and A.B.-2's deceased body was located in the home with A.B.-1. Thus, A.B.-1 lived in the home where his sister had alcohol in her system upon her death, and she lay dead so long she was decomposing, all of which constitutes direct evidence of the abuse and neglect of A.B.-1. The court further did not err in finding A.B.-1 to be abused due to the petitioner's abuse of A.B.-2, another child residing in the home, which puts him at a risk of harm. *See* Syl. pt. 2, *In re Christina L.*, 194 W. Va. 446, 460 S.E.2d 692 (1995) ("Where there is clear and convincing evidence that a child has suffered physical and/or sexual abuse while in the custody of his or her parent(s), guardian, or custodian, another child residing in the home when the abuse took place who is not a direct victim of the physical and/or sexual abuse but is at risk of being abused is an abused child under [West Virginia Code § 49-1-201]."); *see also* W. Va. Code § 49-1-201 (including in the definition of abused child "a child whose health or welfare is being harmed or threatened by . . . [a] parent . . . who knowingly or intentionally inflicts [or] attempts to inflict . . . physical injury or mental or emotional injury, upon the child *or another child in the home*" (emphasis added)).

Although the petitioner's self-serving testimony at adjudication was that she did not cause A.B.-2's death and did not use methamphetamine, she admitted to smoking marijuana on the day the child's deceased body was found and that she did not check on A.B.-2 for three hours. The court specifically noted the lack of credibility in the petitioner's testimony, and because the circuit court is better situated to measure witness credibility, we do not "second guess such determinations." *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997).

Regarding the court's adjudication of J.S. as an abused and neglected child, to the extent that the petitioner raises a passing issue of notice in her brief, the petition was legally sufficient to allow her to respond to the DHS's allegations that she had abused and neglected J.S. The allegations in the petition, which included claims that that the petitioner's conduct resulted in a failure to provide the children with necessary food, clothing, supervision, housing, and, at times, financial support, provided ample notice and were "sufficiently specific" to inform the petitioner of the petition's basis, allowing her "a reasonable opportunity to prepare a rebuttal." *See* Syl. pt. 1, *State v. Scritchfield*, 167 W. Va. 683, 280 S.E.2d 315 (1981) ("If the allegations of fact in a child neglect petition are sufficiently specific to inform the custodian of the infants of the basis upon which the petition is brought, and thus afford a reasonable opportunity to prepare a rebuttal, the child neglect petition is legally sufficient.").

The petitioner further argues that the circuit court erred in adjudicating J.S. as an abused and neglected child because J.S. was not in the petitioner's custody at the time of the filing of the petition. Still, the fact that a child lives outside of a parent's home at the time a petition is filed does not preclude a finding, if such finding is supported by the evidence, that the child is abused or neglected. *See* Syl. pt. 3, in part, *In re B.V.*, 248 W. Va. 29, 886 S.E.2d 364 (2023) (noting that a child's placement in a legal guardianship "does not preclude a circuit court from exercising subject matter jurisdiction in adjudicating whatever rights a respondent to that petition may still have to that child, provided that the child meets the definition of an 'abused child' or 'neglected child' as defined in West Virginia Code § 49-1-201 (2018) so as to confer that jurisdiction"). A "neglected child" is defined as a child "[w]hose physical or mental health is harmed or threatened by a present refusal, failure or inability of the child's parent . . . to supply the child with necessary food, clothing, shelter, supervision, medical care, or education[.]" W. Va. Code § 49-1-201. Furthermore, "abandonment" means "any conduct that demonstrates the settled purpose to forego the duties and parental responsibilities to the child." *Id.* Here, although J.S. was not in the petitioner's care or custody at the time the DHS's petition was filed, the court found that petitioner neither had any contact with the child in several years, nor had she provided any type of support during that time. Pursuant to her own admissions during her testimony, the petitioner had not seen J.S. about five years. Furthermore, during the proceedings, J.S.'s father proffered that while he was granted child support, the petitioner never provided it. By "not asserting [her] parental rights, [p]etitioner demonstrated a settled purpose to forgo [her] responsibilities and duties" to J.S. *In re C.M.-1*, 247 W. Va. 744, 749, 885 S.E.2d 875, 880 (2023). When a non-custodial parent fails to "'show interest in the child's welfare and provide financial and emotional support for the child,'" that failure is "'strong evidence of abandonment.'" *Id.* (quoting *In re R.R.*, No. 17-0930, 2018 WL 1251845, at *3 (W. Va. March 12, 2018) (memorandum decision)). Based on the evidence before it, the circuit court did not err in determining that J.S. was a neglected child, and we find no error in the court's adjudicatory decision regarding J.S.

As to termination, we also conclude that the circuit court did not err in terminating the petitioner's parental rights. The petitioner contends that the circuit court failed to require the DHS to provide her with services that could assist with her substance abuse issues, that the circuit court could have deployed less restrictive dispositional alternatives, and that the termination of her parental rights was in error. In regard to the petitioner's argument that the circuit court erred by denying her substance abuse services, this abuse and neglect proceeding occurred on the heels of a prior proceeding, with similar issues of the petitioner's substance abuse and A.B.-2's malnourishment, and where services were provided to remedy these conditions. Before the petitioner regained custody at the conclusion of the earlier proceeding, she both completed her improvement period and received services. It is apparent from the record that the circuit court absolved the DHS of its duty to provide those services in this proceeding consistent with West Virginia Code § 49-4-604(c)(7). *See In re C.C.*, No. 19-0322, 2019 WL 6139581, at *5 (W. Va. Nov. 19, 2019) (memorandum decision) (concerning the reoccurrence of deplorable housing

conditions). Furthermore, the petitioner's argument regarding her failure to receive services is skeletal—only two sentences—and is insufficient to disrupt the circuit court's determination below.

Regarding dispositional alternatives, a circuit court may terminate a parent's parental rights "without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(c)(6)] that conditions of neglect or abuse can be substantially corrected." Syl. pt. 2, in part, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980). The circuit court found that the conditions which gave rise to the petition in this case could not be substantially corrected. The evidence before the court supports this finding as to A.B.-1: the 2020 petition arose, in part, from A.B.-2's malnourishment and the petitioner's substance abuse, yet shortly after A.B.-1 and A.B.-2's return to the petitioner's custody after she completed her improvement period, A.B.-2 died, her body was discovered in a state of decay while A.B.-1 was present, and the petitioner's substance abuse continued, which she repeatedly denied. Furthermore, in regard to J.S., there was no reasonable likelihood that the conditions of neglect or abuse could be "substantially corrected" when "[t]he abusing parent or parents have abandoned the child," like the petitioner abandoned J.S. W. Va. Code § 49-4-604(d)(4).

For the same reasons, the evidence established that the petitioner failed to make any rehabilitative efforts to reduce or prevent the abuse or neglect of her children. *See* W. Va. Code § 49-4-604(d)(3) (setting forth that there is no reasonable likelihood that conditions of neglect or abuse can be substantially corrected when "[t]he abusing parent or parents have not responded to or followed through with a reasonable family case plan or other rehabilitative efforts"). In the prior proceeding, the petitioner completed an improvement period and her two children were returned to her, yet A.B.-2 died three months after returning to her custody while the petitioner allowed A.B.-1 to reside in the same home as his sister's decaying corpse, and the petitioner screened positive for methamphetamine on the date her child's death was discovered.

Furthermore, the circuit court also considered the petitioner's failure to acknowledge any wrongdoing. This Court has often noted that "'to remedy the abuse and/or neglect problem, the problem must first be acknowledged.'" *In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (quoting *In re Charity H.*, 215 W. Va. 208, 217, 599 S.E.2d 631, 640 (2004) (per curiam)). The petitioner's "'[f]ailure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable.'" *Id.* (quoting *In re Charity H.*, 215 W. Va. at 217, 599 S.E.2d at 640). While the petitioner failed to appear for the dispositional hearing, when she testified earlier in the proceedings, she stated that she did not feel any responsibility for A.B.-2's death and denied that she used methamphetamine despite evidence of a positive screen for that drug. Even on appeal, the petitioner asserts that A.B.-2 died of "natural causes," a gross misstatement of the pathologist's testimony. The pathologist's testimony was that A.B.-2's

7

manner of death was "undetermined," yet indicated that the child received alcohol and was extremely dehydrated and malnourished. In light of the circumstances in which first responders found A.B.-2, the very real threat of harm to A.B.-1 demonstrates that termination was clearly in his best interests, and the court correctly found it proper to terminate the petitioner's parental rights, rather than implementing a dispositional alternative. To the extent that petitioner argues that the DHS failed to prove that she caused A.B.-2's death and, in turn, that termination was not justified, her argument ignores the grim testimony from emergency personnel regarding the circumstances in which they found A.B.-2 deceased, while A.B.-1 was present and living in the same home, and further disregards her abandonment of J.S.

Accordingly, for the foregoing reasons, we find no error in the decision of the circuit court, and its February 28, 2023 order is hereby affirmed.

Affirmed.

**ISSUED**: June 7, 2024

**CONCURRED IN BY**:

Chief Justice Tim Armstead
Justice Elizabeth D. Walker
Justice John A. Hutchison
Justice William R. Wooton
Justice C. Haley Bunn