**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **V.M.**

**No. 25-489** (Kanawha County CC-20-2023-JA-331)

## MEMORANDUM DECISION

Petitioner Mother T.M.[1] appeals the Circuit Court of Kanawha County's June 16, 2025, order terminating her parental rights to V.M., arguing that the circuit court erred in terminating her parental rights and in failing to impose a less restrictive dispositional alternative.[2] Upon our review, we determine that oral argument is unnecessary and that a memorandum decision affirming the circuit court's order is appropriate. *See* W. Va. R. App. P. 21.

In September 2023, the DHS filed an abuse and neglect petition after V.M. began exhibiting symptoms of substance withdrawal shortly after birth. The DHS alleged that the petitioner disclosed abusing drugs, including fentanyl, methamphetamine, and benzodiazepines while pregnant and that she received limited prenatal care. The DHS further alleged that the petitioner lacked suitable housing for herself and the child, as the petitioner was homeless. Finally, the DHS alleged that the petitioner's parental rights to another child had been involuntarily terminated due to the same conditions—her substance abuse and homelessness. Based upon these allegations, the DHS asserted that the petitioner had not remedied the conditions of abuse and neglect that resulted in the prior termination of her parental rights and that the petitioner had neglected V.M. At a preliminary hearing in October 2023, the petitioner represented that she had started inpatient drug treatment and requested services. The circuit court held her request for services in abeyance pending her completion of treatment.

At the November 2023 adjudicatory hearing, the petitioner stipulated to the DHS's allegations of substance abuse and that the same resulted in a risk to the child's health and safety. The circuit court accepted the petitioner's stipulation and, accordingly, adjudicated her as an abusing parent and V.M. as a neglected child. The court also granted the petitioner a post-adjudicatory improvement period based on her ongoing participation in her inpatient treatment, the terms of which required the petitioner to continue treatment, drug screen, participate in

---

[1] The petitioner appears by counsel Sandra K. Bullman. The West Virginia Department of Human Services ("DHS") appears by counsel Attorney General John B. McCuskey and Assistant Attorney General Carl E. Hostler. Counsel Bryan B. Escue appears as the child's guardian ad litem ("guardian").

[2] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

parenting and adult life skills classes, and comply with all other services recommended by the multidisciplinary team ("MDT"). The court further ordered the MDT to discuss terms and conditions that would allow the petitioner to have supervised visits with V.M.

The circuit court held a series of review hearings beginning in January 2024. The resulting orders and DHS summaries indicate that the petitioner was compliant with services and, by July 2024, had started unsupervised visitation with V.M. However, at a review hearing on July 8, 2024, the DHS and guardian expressed concerns after the petitioner admitted to resuming her relationship with the child's father—who had been adjudicated due to abandoning V.M. and had been convicted for conspiracy to distribute methamphetamine and fentanyl—because of the petitioner's history of substance abuse. The court advised the petitioner that her long-term recovery required that she demonstrate that she would make decisions that were in the best interests of the child and ordered that unsupervised visits cease until the MDT addressed the petitioner's continued relationship with the father. At a meeting on July 18, 2024, the MDT agreed to resume unsupervised visits if the petitioner began individual and domestic violence therapy and continued with previously ordered services.

The circuit court held a final review hearing in October 2024, where it acknowledged receiving a summary filed by the DHS. In this summary, the DHS stated that the petitioner had refused to drug screen on two occasions; had suddenly left her father's home, which the DHS had previously determined to be suitable housing; had started living with her mother and maternal grandparents; and was no longer employed. The summary further asserted that, due to concerns about a potential relapse, visitation was reverted to supervised visits once a week. At the hearing, the DHS and guardian also expressed concern that the petitioner had become erratic after moving into the home of her mother, who had a history of substance abuse and erratic behavior. As a result, the court ended the petitioner's visits with V.M. pending consecutive negative drug screens, ordered that services for the petitioner continue, and set the matter for disposition.

Following several continuances, the circuit court held the final dispositional hearing in March 2025. A service provider from Liam's Place testified that the petitioner had stopped participating in her parenting and adult life skills classes and domestic violence counselling in mid-January, had not had any visits with V.M. since late January, and had stopped drug screening in early February. A Child Protective Services ("CPS") worker testified that the petitioner, despite previously representing to the DHS that she had started individualized therapy, had never gone further than to attend the initial intake appointment and had expressed her belief that "she didn't need therapy." The CPS worker stated that the petitioner had moved from a stable residence with her father to her maternal grandparents' home, where she lived with six other family members. Further, the CPS worker asserted that there were concerns regarding the petitioner's mental health and a possible relapse, as the petitioner had indicated that she was going to Atlanta to see the father's "clone" and had attacked her sister and "call[ed] her . . . a demon." The CPS worker also represented that the petitioner made social media posts about being in a relationship with child's father in early February 2025.

The petitioner then testified, asserting that she had not used any drugs since September 2023 and had stopped participating in services because she "felt that the services were no longer needed," despite knowing that she would not be able to see V.M. as a result. The petitioner then

stated that she felt ready to have V.M. returned to her and denied having any contact with the child's father following an MDT meeting in February 2025. The petitioner then admitted that she had a diagnosis of mental health issues but refused to receive any treatment for those issues. The petitioner's testimony concluded with her expressing that she did not have to further comply with services because she "ha[d] complied for the past year and a half." The petitioner's maternal grandmother testified that the petitioner was not working outside of the house and that the home was suitable for V.M. Finally, the petitioner's sister testified that the petitioner had been posting on social media about the proceedings and recounted two incidents—during the pendency of the proceedings—where the petitioner approached her and began screaming at her in the presence of the sister's children. During the second incident, which occurred at a high school football game, the petitioner claimed that her sister "had demons" and had to be restrained "so that nobody would be physically attacked."

Based upon the evidence presented, the circuit court concluded that there was no reasonable likelihood that the petitioner could substantially correct the conditions of neglect in the near future. The court acknowledged that the petitioner had "come a long way with her substance abuse treatment," but found that the petitioner "knowingly stopped participating in the remedial services offered." The court further found that the petitioner's social media posts indicated a continued relationship with the child's father, whose rights had been terminated, and that the petitioner did not have stable housing. As a result, the court determined that the petitioner's conduct demonstrated an inadequate capacity to solve the problems of abuse and neglect on her own or with help. The court further found that the petitioner's actions had disrupted any bond the petitioner may have had with the child. Finally, the court concluded that V.M.'s best interests required termination of the petitioner's parental rights and that there were no less drastic alternatives available. Thus, the court terminated the petitioner's parental rights to V.M.[3] It is from the dispositional order that the petitioner appeals.

On appeal from a final order in an abuse and neglect proceeding, this Court reviews the circuit court's findings of fact for clear error and its conclusions of law de novo. Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011). Before this Court, the petitioner first argues that the circuit court erred in terminating her parental rights, asserting that she "successfully corrected the condition which led to the filing of the petition," in effect challenging the court's finding that there was no reasonable likelihood that the conditions of neglect could be substantially corrected in the near future. We disagree. The court expressly found that the petitioner knowingly stopped participating in the remedial services offered. Pursuant to West Virginia Code § 49-4-604(d)(3), a circuit court may find that there is no reasonable likelihood that the conditions of neglect can be substantially corrected when "[t]he abusing parent . . . ha[s] not responded to or followed through with a reasonable family case plan or other rehabilitative efforts." In support of her argument, the petitioner cites to a June 2024 DHS court summary indicating that she was compliant with services, had obtained suitable housing, and had a stable job. However, by the time of the dispositional hearing, the record shows that the petitioner was living in a new home, which the court found to be unsuitable; that she lacked stable employment; and that the petitioner—by her own admission—

---

[3] The court also terminated the father's parental rights. The permanency plan for the child is adoption in his current placement.

had become wholly noncompliant with the services offered to her. Further, even when the petitioner appeared compliant with the offered services, the record shows that she never participated in individual therapy as recommended by the MDT, despite compliance with MDT recommendations being an express term of her improvement period. As such, the record contains sufficient evidence to support the circuit court's finding that there was no reasonable likelihood that the petitioner could correct the conditions of neglect in the near future. *See* W. Va. Code § 49-4-604(d) ("'No reasonable likelihood that conditions of neglect . . . can be substantially corrected' means that, based upon the evidence before the court, the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help.").

The petitioner further argues that the circuit court erred in terminating her parental rights instead of imposing a less restrictive alternative, such as placing the child in a "temporary legal guardianship," to allow her to obtain suitable housing. However, we have held that termination of parental rights "may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood . . . that conditions of neglect . . . can be substantially corrected." Syl. Pt. 5, in part, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011) (quoting Syl. Pt. 2, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980)). As stated above, the court properly found that there was no reasonable likelihood that the conditions of neglect could be substantially corrected in the near future. Moreover, the court found that the child's best interests required termination of the petitioner's rights, and the petitioner does not challenge this finding. As such, we conclude that the circuit court did not err in terminating the petitioner's parental rights. *See* W. Va. Code § 49-4-604(c)(6) (allowing the termination of parental rights "[u]pon a finding that there is no reasonable likelihood that the conditions of neglect . . . can be substantially corrected in the near future and, when necessary for the welfare of the child").[4]

For the foregoing reasons, we find no error in the decision of the circuit court, and its June 16, 2025, dispositional order is hereby affirmed.

Affirmed.

**ISSUED**: March 24, 2026

---

[4] The petitioner raises an additional assignment of error arguing that the circuit court erred by prohibiting post-termination visitation. However, the petitioner fails to comply with Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure, as her brief does not "includ[e] citations that pinpoint when and how the issues in the assignments of error were presented to the lower tribunal." The petitioner cites to no portion of the record where she or any other party requested that she be granted post-termination visitation, instead citing only to a DHS court summary discussing the status of her unsupervised visits with V.M. as of June 28, 2024. Given that Rule 10(c)(7) permits this Court to "disregard errors that are not adequately supported by specific references to the record on appeal," we decline to address this argument.

**CONCURRED IN BY**:

Chief Justice C. Haley Bunn
Justice William R. Wooton
Justice Charles S. Trump IV
Justice Thomas H. Ewing
Justice Gerald M. Titus III